2009 WY 39

**Eugene M. LANGBERG, Appellant (Petitioner),**

v.

**STATE of Wyoming ex rel. WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

No. S-08-0001.

Supreme Court of Wyoming.

March 18, 2009.

Representing Appellant: Thomas L. Lee, Attorney at Law, Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General; J.C. Demers, Special Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Eugene Langberg suffered two separate injuries to his left wrist while on the job. Ultimately, he underwent surgery on his wrist. The Workers' Compensation Division (the Division) covered the initial treatment for the injuries but denied coverage for the surgery. The Division found the surgery to be necessitated by a preexisting condition that was not materially aggravated by his job injuries. The district court upheld the Division's final determination. We reverse.

## ISSUES

[¶ 2] Langberg presents two issues:

1. Did the Hearing Examiner correctly find that [Langberg's] condition was a preexisting condition?

2. If so, did the Hearing Examiner correctly find that the work place incidents did not materially aggravate [Langberg's] preexisting condition?

## FACTS[1]

[¶ 3] In June 2005, Langberg was employed with the City of Cheyenne, Parks and Recreation Division. On June 27, he injured his left wrist moving a metal picnic table with attached benches weighing over two hundred pounds. Langberg testified he heard and felt a pop and immediate pain in the ulnar side of his left wrist. Langberg also suffered tingling along the lateral aspect of the fifth finger. Langberg reported the injury to his supervisor, who told him to complete an injury report and seek medical attention. An x-ray revealed no abnormalities. Langberg was diagnosed with a wrist sprain and given a wrist splint. The Division determined the injury to be compensable.

[¶ 4] In October 2005, while still working for the Parks and Recreation Division, Langberg again injured his left wrist in the exact same location while shoveling snow. The pain from this injury was far more intense than the June injury. Langberg notified his supervisor. The supervisor told Langberg to seek immediate medical attention.[2]

[¶ 5] At this stage Langberg was diagnosed as suffering from carpal tunnel syndrome in his left wrist. Langberg underwent physical therapy for the condition, but the pain did not resolve. Langberg was referred to Dr. Judson Cook for further evaluation. Dr. Cook ordered an MRI and a nerve conduction study on the left wrist. The nerve conduction study was normal. The MRI showed findings "worrisome for Kienbock's disease with cystic degeneration and early fragmentation and collapse along the radial side of the lunate at the scapholunate articulation."[3] Dr. Cook referred Langberg to an orthopedic specialist, Dr. Jean Basta, for consultation.

[¶ 6] Langberg saw Dr. Basta on October 31, 2005. Dr. Basta definitively ruled out carpal tunnel syndrome. Dr. Basta took new x-rays of the wrist. According to Dr. Basta's notes, the new "x-rays show a little bit of cyst in the lunate. It looks like a little bit of Kienbock disease. His MRI shows the same thing." Because of the suspected Kienbock's, Dr. Basta put a wrist cast on Langberg's left wrist to immobilize it.

[¶ 7] In early December, Langberg sought treatment from Dr. Mark Durbin, an orthopedic surgeon specializing in hand and upper extremity surgery. Dr. Durbin definitively diagnosed Langberg as suffering from Kienbock's disease. Dr. Durbin operated on Langberg's left wrist shortly after the first visit. Through deposition, Dr. Durbin testified he conducted the surgery "[b]ecause on the MRI it showed that the cyst had some collapse to it, and that he was developing avascular necrosis to the lunate." Dr. Durbin testified the most significant finding of

---

1. The hearing examiner expressly found Langberg's testimony credible. Since he was the only witness at the hearing, and all medical evidence is consistent, there are no factual disputes.

2. The Division argued the second injury should not be considered because it was not properly reported. The Division made this argument directly before the OAH, and the OAH found against the Division on the issue. The Division did not appeal the decision. We therefore will consider both injuries.

3. Kienbock's disease is a progressive, degenerative disease causing a loss of blood supply to the lunate bone, thus causing the bone to die (avascular necrosis).

the surgery was his identification "that the bone had minimal vascularity to it, and bone becomes very hard when it loses its vascular supply, so the bone was dying." This is consistent with Kienbock's. Ultimately, Dr. Durbin opined that the work injury(ies) materially exacerbated the disease.

[¶ 8] Meanwhile, on November 14, 2005, the Division issued a final determination denying benefits for treatment of medical symptoms relating to Kienbock's disease. Langberg objected to the denial and timely requested a hearing. The matter was referred to the Office of Administrative Hearings (OAH). The OAH granted Langberg medical benefits for all treatments up until surgery, considering those treatments diagnostic. Medical benefits for the surgery, which the OAH considered solely related to Kienbock's, as well as any further expenses related to Kienbock's disease, were denied.

[¶ 9] Specifically, the OAH determined there was insufficient evidence to prove the work injuries caused Langberg's Kienbock's disease. Rather, the OAH determined the Kienbock's disease was a preexisting condition. Langberg thus was required to prove his two work injuries materially aggravated his Kienbock's disease. The OAH determined Langberg had not met his burden.

## DISCUSSION

[¶ 10] As is well known, we are statutorily constrained in our review of contested case hearings to determining if the agency's decision is supported by substantial evidence, is arbitrary and capricious, or is otherwise not in accordance with law. Wyo. Stat. Ann. § 16-3-114(c)(ii)(A) and (c)(ii)(E) (LexisNexis 2007). We defer to an agency's findings of fact if supported by substantial evidence upon the record as a whole. We review questions of law de novo. We are not at liberty to substitute our judgment for that of the agency if the agency decision is reasonable under the circumstances. *Dale v. S & S Builders, LLC*, 2008 WY 84 ¶¶ 21–26, 188 P.3d 554, 561–62 (Wyo.2008). It is the claimant's burden to prove all elements of the claim. If the OAH determines the claimant did not meet his or her burden of proof, we review the finding to determine "whether

that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole." *Id.* at ¶ 22, 188 P.3d 554; *see also Horn–Dalton v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2009 WY 14, ¶ 7, 200 P.3d 810, 813 (Wyo.2009).

*Causation of Kienbock's disease*

[¶ 11] Langberg argues the evidence is sufficient to prove the cause of his Kienbock's disease was a single traumatic injury. He primarily relies on the fact that the x-rays taken after the first injury in June did not show any abnormalities. The x-rays taken by Dr. Basta at the end of October revealed a "little bit of cyst in the lunate." When combined with Langberg's testimony that he had no prior problems with his wrist, Langberg argues this circumstantial evidence irrefutably points to the work injury(ies) being the trigger for the onset of his Kienbock's disease.

[¶ 12] We agree with Langberg's general theory that it is possible for proof of lack of medical problems before a work injury and change immediately following the injury to establish the medical impairment was caused by the work injury. *See, e.g., McIntosh v. State ex rel. Wyoming Medical Comm' n*, 2007 WY 108, 162 P.3d 483 (Wyo.2007); *Murray v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 993 P.2d 327, 332 (Wyo.1999). All cases, however, are decided on their own facts and circumstances, with all facts being taken into account. In this case, Langberg's hypothesis is refuted by his own treating physician, Dr. Durbin.

[¶ 13] Dr. Durbin testified at the hearing by means of deposition. He testified that Langberg suffered from early stage Kienbock's disease. He explained the cause of Kienbock's disease is unknown. Dr. Durbin testified he is aware of some indication in medical literature that it might be caused by trauma, but he did not know of any proof supporting this theory. On the contrary, many cases of Kienbock's disease are not caused by an identifiable trauma.

[¶ 14] As for Langberg's case in particular, Dr. Durbin found no significance in the fact that Langberg had no wrist problems

prior to his work injuries. Dr. Durbin testified that, while the work injuries certainly precipitated Langberg's wrist pain, he could only speculate as to whether the injuries actually caused the onset of Kienbock's disease. Ultimately, Dr. Durbin testified: "did the Kienbock's start from the original injury? I can't necessarily say it did."

[¶ 15] Langberg argues this testimony is ambivalent as to whether a single traumatic event caused his Kienbock's disease. He points out that, while Dr. Durbin testified he couldn't say the injury(ies) did cause the onset of the disease, he also testified he couldn't say the injury(ies) did not cause the onset of the disease. Langberg argues this ambiguity negates any reliance on Dr. Durbin's testimony regarding causation. Consequently, his theory that the work injuries are the causative factor is the only viable theory.

[¶ 16] The flaw in Langberg's reasoning is that Dr. Durbin, an expert in the field and intimately familiar with Langberg's medical condition, effectively testified that Langberg's theory is pure speculation. Speculation does not rise to the level of proof needed to support a finding that his Kienbock's disease was a direct result of his work injury(ies). *Anastos v. General Chem. Soda Ash*, 2005 WY 122, ¶ 21, 120 P.3d 658, 666 (Wyo.2005); *Frazier v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 997 P.2d 487, 490 (Wyo.2000). In the face of the direct medical testimony from Langberg's own treating physician, we find the OAH's decision is not against the overwhelming weight of the evidence. Consequently, we agree Langberg's Kienbock's disease was not caused by his work injury(ies) but rather was a preexisting condition.

*Material aggravation of a preexisting condition*

[¶ 17] As a general rule, treatment for a condition preexisting the start of employment is not compensable. Wyo. Stat. Ann. § 27–14–102(a)(xi)(F) (LexisNexis 2007). A compensable claim might arise, however, " 'if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the ... disability for which compensation is sought.' 1 Larson's Workmen's Compensation Law, § 12.20, p. 3–276." *Lindbloom v. Teton International*, 684 P.2d 1388, 1390 (Wyo.1984); *see also Ramos v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2007 WY 85, ¶ 17, 158 P.3d 670, 676 (Wyo.2007); *Boyce v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2005 WY 9, ¶ 10, 105 P.3d 451, 455 (Wyo. 2005). It is Langberg's burden to prove, by a preponderance of the evidence, his work-related injuries materially aggravated, accelerated, or combined with his Kienbock's to necessitate the surgery for which he is seeking compensation. *State ex rel. Wyoming Workers' Safety & Comp. Div. v. Slaymaker*, 2007 WY 65, ¶ 14, 156 P.3d 977, 982 (Wyo. 2007); *Salas v. Gen. Chem.*, 2003 WY 79, ¶ 10, 71 P.3d 708, 711 (Wyo.2003); *Lindbloom*, 684 P.2d at 1389–90.

[¶ 18] Langberg relies on two categories of evidence in support of his claim for benefits. First, Langberg relies on the circumstances, including the fact that he had no history of left wrist problems before the work injuries. Rather, his problems began after the injuries. The second category is the testimony of Dr. Durbin, most especially Dr. Durbin's testimony that Langberg's injuries materially exacerbated his Kienbock's.

[¶ 19] The Division engages Langberg over the definition of "exacerbate." Langberg argues the term is synonymous with "aggravate." The Division argues the two terms not only are not interchangeable, but in fact are mutually exclusive. Unfortunately, nobody asked Dr. Durbin to define the word "exacerbate" as he was using it or compare it to the word "aggravate."

[¶ 20] The positions of both parties find support in reference books. In the Online Merriam Webster Dictionary, "aggravate" and "exacerbate" share a common definition—to make more severe. *Compare* http://www.merriam-webster.com/dictionary/exacerbate with http://www.merriam-webster.com/dictionary/aggravate. The same is true in the Online Merriam Webster Medical Dictionary. *Compare* http://www.merriam-webster.com/medical/exacerbate with http://www.merriam-webster.com/medical/aggravate.

[¶ 21] The Division, for its part, insists the term "exacerbate" as used by Dr. Durbin under the facts of this case is consistent with the term as defined in the American Medical Association Guides to the Evaluation of Permanent Impairment (Guides).[4] The Division argues that, in the Guides, "exacerbation" is defined as a short-term increase in severity of a preexisting medical impairment; this contrasts with "aggravation," which is defined as a permanent increase in severity of a preexisting medical impairment. Under these definitions, a finding of one contraindicates a finding of the other. Indeed, the Division points out the Guides expressly states that "[e]xacerbation does not equal aggravation."

[¶ 22] We initially note that, as suggested by its title, the Guides applies to the evaluation of permanent impairments. Dr. Durbin was not engaged in rating a permanent impairment. Instead, he was Langberg's treating physician. Consequently, the Guides's definitions do not automatically apply to this situation. We still, however, must determine whether Dr. Durbin, on his own, used the word "exacerbate" as a unique, more limiting term than the term "aggravate."

[¶ 23] We find the question of whether Dr. Durbin used the term "exacerbation" in the same context as the Guides is determined by the language of the Guides itself. We note the Division quotes only a portion of the applicable language in the Guides. In full, the Guides read:

> Exacerbation: *Temporary* worsening of a preexisting condition. Following a transient increase in symptoms, signs, disability, and/or impairment, the person recovers to his or her baseline status, or what it would have been had the exacerbation never occurred. Given a condition whose natural history is one of progressive worsening, following a prolonged but still temporary worsening, return to pre-exacerbation status would not be expected, despite the absence of permanent residuals from the new cause.

Robert D. Rondinelli, et al., AMA *Guides to the Evaluation of Permanent Impairment* 611 (6th ed.2008) (emphasis in original).

> Aggravation: *Permanent* worsening of a preexisting condition. A physical, chemical, biological, or other factor results in an increase in symptoms, signs, and/or impairment that never returns to baseline, or what it would have been except for the aggravation (the level pre-determined by the natural history of the antecedent injury or illness).

*Id.* at 609 (emphasis in original). The Guides briefly discuss the differentiation between the terms in the body of the text:

> Although there are circumstances in which an event was the sole or primary cause of a given effect, in many instances patients have preexisting pathology that may have contributed to their current clinical condition. *Aggravation* is a circumstance or event that permanently worsens a preexisting or underlying condition. The terms *exacerbation, recurrence, or flare-up* generally imply worsening of a condition temporarily, which subsequently returns to baseline. Exacerbation does not equal aggravation.

*Id.* at 25 (emphasis in original).

[¶ 24] Langberg's case certainly was not one of a temporary increase in severity. His condition was dormant prior to his injuries. The injuries began the process of pain. As the Guides recognize, returning to baseline is not expected in the case of a progressive degenerative disease. Therefore, Dr. Durbin could not have been using the term "exacerbate" as defined by the Guides.

[¶ 25] Under the specific circumstances of this case, we find no ambiguity in Dr. Durbin's use of the term "exacerbate." Dr. Durbin used the word "exacerbate" consistently with its common dictionary definition—to increase in severity. Any finding to the contrary is against the overwhelming weight of the evidence.

■ [¶ 26] Dr. Durbin's testimony is sufficient to establish a causal link between Langberg's work injuries and his surgery:

---

4. The Guides consists of one volume.

[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury.

*Pino v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 996 P.2d 679, 685 (Wyo.2000); *see also Salas*, ¶ 10, 71 P.3d at 712. Dr. Durbin's exact testimony is:

I can't tell you when the Kienbock's disease started, but I know that the pain started in that time when he felt something pop in his wrist. So did the Kienbock's start from the original injury? I can't necessarily say it did. Did the original injury exacerbate the Kienbock's and cause pain? More likely than not.

Dr. Durbin considered this a material exacerbation. Dr. Durbin's direct testimony on the issue overwhelmingly establishes the requisite causal connection between Langberg's work-related injuries and his surgery.

## CONCLUSION

[¶ 27] Dr. Durbin testified Kienbock's disease is of unknown etiology. Therefore, he could only speculate as to the cause and time of onset of Langberg's Kienbock's disease. No other evidence was introduced regarding the onset of the disease. Consequently, we affirm the OAH's determination that Langberg's work-related injuries did not cause his Kienbock's disease.

[¶ 28] We find, however, that Langberg's work-related injuries did materially aggravate his Kienbock's disease, leading directly to his need for surgery. Langberg's Kienbock's disease was dormant prior to his work-related injuries. After his original injury, he heard and felt a pop in his left wrist and experienced pain. After his second injury the pain in his left wrist increased in severity. These injuries signify acute trauma rather than simply a natural progression of the disease. Dr. Durbin expressly testified the work-related injuries materially exacerbated his Kienbock's disease.

[¶ 29] Given this evidence, and upon review of the record as a whole, the evidence overwhelmingly supports a finding that Langberg's work-related injuries led to his need for surgery. The OAH erred in determining otherwise. The case is reversed and remanded for the award of appropriate benefits.