2010 WY 85

**Lois JUDD, Appellant (Petitioner),**

**v.**

**STATE of Wyoming ex rel. WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

**No. S–09–0095.**

Supreme Court of Wyoming.

June 25, 2010.

Representing Appellant: Nancy L. Williams, Attorney at Law, Douglas, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Lois Judd suffered an injury to her right knee while at work. The Workers' Compensation Division (Division) found the injury to be compensable and awarded benefits. Judd's knee continued to cause her pain and approximately six months later she sought preauthorization from the Division for knee replacement surgery on her right knee. The Division determined that Judd's current knee problems related solely to preexisting degenerative arthritis and denied further benefits. The Division's denial was upheld by the Medical Commission and affirmed by the district court. We reverse.

## ISSUES

[¶ 2] Judd presents these issues on appeal:

A. Did the Medical Commission have jurisdiction to hear this case?

B. Was the decision by the Medical Commission Hearing Panel arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with the law?

C. Was the Findings of Fact, Conclusions of Law and Order of Medical Commission Hearing Panel denying benefits for total right knee replacement supported by substantial evidence?

## FACTS

[¶ 3] Lois Judd began working as an aide for North Platte Physical Therapy of Douglas, Wyoming, on August 19, 2006. As an aide, Judd's responsibilities included direct patient care, transfer of patients, administration of exercises at the instruction of the therapist, and general maintenance of the therapy department. On November 8, 2006, while working, Judd tripped, fell to the floor and injured her right knee. She immediately experienced pain, swelling and decreased range of motion in her right knee. Dr. Mark Murphy, who would become Judd's treating physician, was in the vicinity and looked at Judd's knee. Dr. Murphy instructed that heat be applied to the knee, that Judd make an appointment for an examination, and that she stay off the knee until her appointment.

[¶ 4] On November 9, 2006, the day following her work injury, Judd had an x-ray taken of her right knee. The x-ray showed severe arthritic disease in the patellofemoral compartment and an old injury to the medial collateral ligament.

[¶ 5] On November 22, 2006, Judd saw Dr. Murphy for a formal examination. During that examination, Judd reported that she had continuing pain and swelling, that she had been doing physical therapy since the injury and that she was still using crutches. Judd also reported that prior to her November 8, 2006, fall, she had experienced some aching in her right knee with changes in the weather. On that same date, Judd had an MRI taken of her right knee. The MRI showed:

1) Considerable degenerative disease of the medial compartment with loss of areas of the femoral and tibial cartilage, increased bone density/sclerosis of the articulating surface with some irregularity, marginal osteophyte formation, and increased T2 signal/edema in the anterior portion of the medial tibial plateau and adjacent femoral condyle.

2) Irregularities and increased signal in the menisci, particularly the medial, consistent with degenerative change. A definite surface communicating tear is not clearly seen on both views, but it appears to be present in the posterior horn of the medial meniscus.

3) Small approximately 1cm popliteal cyst.

4) Mild degenerative changes of the lateral and patellofemoral articulations.

[¶ 6] Judd saw Dr. Murphy again on November 29, 2006, and underwent arthroscopic surgery on her right knee on November 30, 2006. Dr. Murphy's Operative Report reported the following postoperative diagnoses:

1. Right knee medial meniscus tear, extensive.
2. Extensive grade IV chondromalacia patellofemoral joint.
3. Extensive grade III and IV chondromalacia medial compartment.
4. Medial hypertrophic parapatellar plica.

Dr. Murphy's deposition was taken, and he explained the postoperative diagnoses. Dr. Murphy described the degenerative changes in Judd's right knee as longstanding, and he testified that the medial meniscus tear likely predated Judd's November 8, 2006, fall. He further testified:

Despite the pretty impressive technical and diagnostic abilities of the MRI, direct vision is clearly—gives me a better picture of what's going on.

There was a plica, which is a scarred fold in the joint lining.

There was grade four chondromalacia on the under surface of the patella and in the groove that the patella or kneecap tracks. And grade four is down to raw, exposed bone.

And there was grade three of four chondromalacia of the medial femoral condyle—the inside of her knee—as well as a medial meniscus tear.

I expected to see changes in the cartilage from the changes on her x-ray; I expected the medial meniscus tear. But I—it—but the true extent of damage to the cartilage was really brought home by the direct vision of the cartilage surfaces.

[¶ 7] The Division paid for the arthroscopic surgery on Judd's right knee, and Judd applied for and received temporary total disability benefits for the expected recovery period following that surgery. On December 13, 2006, Judd saw Dr. Murphy and reported that she thought her right knee was improving, but on January 3, 2007, in another follow-up visit, Judd reported frustration with her inability to put weight on her right knee. During the January appointment, Dr. Murphy discussed with Judd the option of total knee replacement for the right knee. On February 7, 2007, an x-ray of Judd's right knee was taken in conjunction with the discussion of a total knee replacement. The x-ray showed diffuse osteoporosis and no acute fracture or dislocation.

[¶ 8] On February 13, 2007, Judd, through Dr. Murphy's office, submitted an application for preauthorization of a total knee replacement surgery on her right knee. The Division responded that it could not provide the requested authorization without additional information concerning the relationship between Judd's work injury and the need for the proposed surgery. On April 17, 2007, the Division sent Judd to Dr. Paul Ruttle, an orthopedic surgeon, for an independent medical evaluation. Dr. Ruttle concluded that Judd's need for total knee replacement surgery on her right knee was not related to her November 2006 work injury:

The patient's current problems appear unrelated to original work exposure. It is clear that this patient has significant pre-existing osteoarthrosis in right knee. A grade IV chondromalacia at patellofemoral joint and medial compartment simply did not develop as the result of a fall while working on November 8, 2006. Indeed, the patient was symptomatic relative to knee, noting aching pain in knee accompanying weather changes prior to operation. It is also of note that the patient has undergone a total knee arthroplasty in the past on left. Approximately 30% of patients who require total knee arthroplasty on one side will develop significant degenerative changes on the contralateral side.

Further complicating the patient's case is the fact that she is 5′2″ and weighs 190 pounds. This results in a body mass index of 35 which is considered obese. Work in the orthopedic and rheumatologic literature in the United States and Europe suggests a strong association between obesity and the development of osteoarthrosis in the knee.

Relative to specific questions, What was the extent of the injury sustained in work injury November 8, 2006? The patient appears to have rendered underlying meniscal pathology symptomatic in the face of severe pre-existing degenerative osteoarthrosis in knee.

In your medical opinion, what disability time frame would you anticipate was related to this injury? Approximately two months. This two month period would allow time in the knee that was not affected by significant pre-existing osteoarthrosis to heal.

Are there more probable causes for misjudged severe arthritic disease and degenerative disease than the incident November 8, 2006? Yes. The rationale for this has been outlined above. As noted, the patient's problems were clearly pre-existing and related in combination to a genetic predisposition to osteoarthrosis in the knee and underlying obesity.

In all medical probability, is the need for total knee replacement a direct result of the November 8, 2006 injury? No. The rationale of this has been outlined above.

Would Ms. Judd's severe arthritic disease and degenerative disease, in your opinion, be primarily due to aging and normal activities of daily living? Yes. Concurrent with genetic predisposition as presented by pathology that was treated with total knee on left and obesity.

[¶ 9] On May 4, 2007, the Division issued a final determination letter denying coverage for the proposed total knee replacement surgery on the right knee based on its conclusion that the need for the surgery was due to Judd's preexisting condition. By separate letter, the Division also informed Judd on May 4, 2007, that based on Dr. Ruttle's evaluation, Judd had reached maximum medical improvement with a one percent permanent partial impairment rating and the Division would no longer be paying her temporary total disability benefits.

[¶ 10] On May 16, 2007, Judd submitted a written objection to the denial of her surgery preauthorization and requested a hearing on that issue. Judd also submitted a response to the permanent partial impairment rating.

In her response, Judd objected to the rating and requested a second opinion. Judd stated as the basis for her objection, "I was not obese as stated when the accident occurred. I was working fine, standing on my feet, and now I can barely walk w/out severe pain."

[¶ 11] The Division referred the issue of Judd's surgery request to the Office of Administrative Hearings (OAH) for hearing and referred the issue of Judd's permanent partial impairment rating to Dr. Anne MacGuire, a rheumatologist, for a second opinion. The OAH determined it lacked jurisdiction over Judd's case because of the nature of the issue and on June 12, 2007, returned the case to the Division for referral to the Medical Commission. On June 15, 2007, the Division referred Judd's request for hearing on the surgery preauthorization request to the Medical Commission.

[¶ 12] On June 25, 2007, Judd was examined by Dr. MacGuire for a second opinion on her permanent partial impairment rating. Dr. MacGuire concluded:

Reviewing the entire case of the injury, the claimant twisted her knee and injured her right medial meniscus. She qualifies for a 1% impairment of the right knee secondary to this injury. All other issues, specifically the extensive degenerative arthritis of the right knee were very clearly pre-existing.

Addressing the questions put to me by the Division:

1. What was the extent of the injuries sustained from the work incident on 11–8–06?

Answer:

The claimant suffered a torn right medial meniscus on 11–8–06. This injury did not cause the extensive pre-existing degenerative arthritis of her right knee.

2. In your medical opinion, what timeframe of disability, would you anticipate related to this injury?

Answer:

It would be my impression that the claimant should have been recovered from the torn medial meniscus within 6–8 weeks.

3. Are there more probable causes for Ms. Judd['s] severe arthritic disease and degenerative disease than the incident on 11–8–06?

Answer:

The claimant has a previous history of significant obesity. At 5′2″ tall with weighing close to 250 pounds, she has had extensive and excessive weight bearing on her knees. The left knee has already been replaced secondary to severe end-stage degenerative arthritis. Dr. Murphy's arthroscopic evaluation, shortly after the injury documented basically bone on bone in an end stage right knee. The current literature reflects that women have more degenerative arthritis of their knees than men in general, usually secondary to excessive weight gain and decreased activity and decreased muscle strength in both lower extremities. Much of the current osteoarthritis at this time is felt to be genetically determined. This claimant had pre-existing left knee arthroplasty secondary to end-stage degenerative arthritis. At the time of this injury, she also had end-stage degenerative arthritis of the right knee. It is expected that the claimant would have needed a right total knee fairly quickly, whether or not she had sustained this minor injury.

4. In all medical probability, is the need for a right total knee replacement a direct result of the 11–8–06 injury?

Answer:

In all medical probability of the need for the right total knee replacement would have occurred within a very short period of time because of the extensive degenerative changes of the claimant's knee. The injury did not cause the need for replacement. The claimant was basically doomed to have a right totally arthroplasty because of pre-existing progressive end-stage degenerative arthritis caused by a multifactorial issues specifically significant obesity, smoking, decreased muscle strength, genetics, activity and poor fitness levels.

5. Would Ms. Judd['s] severe arthritic disease and degenerative disease in your opinion be primarily due to aging and normal activities of day-to-day living?

Answer:

The literature is very clear that Mrs. Judd's severe arthritic disease and degenerative disease in the right and left knees is secondary to multifactorial issues, specifically poor conditioning, poor fitness, genetics, obesity and generalized lack of fitness. These are specifically due to aging and the activities of day-to-day living.

[¶ 13] On August 7, 2007, before the Medical Commission heard and ruled on Judd's request for preauthorization of her total knee replacement surgery, Judd proceeded with the surgery. In his Operative Report, Dr. Murphy, who performed the total knee replacement, listed Judd's preoperative and postoperative diagnoses as right knee osteoarthritis.

[¶ 14] The Medical Commission held its hearing on the disputed issue of worker's compensation coverage for Judd's right knee total knee replacement surgery on February 27, 2008. In addition to the medical records and the independent medical evaluations of Drs. Ruttle and MacGuire, the parties submitted to the Medical Commission the depositions of Dr. Ruttle, Dr. Murphy and Charles Mangus, Judd's supervisor and physical therapist. Judd testified in person during the hearing before the Commission.

[¶ 15] In his deposition testimony, Dr. Ruttle reiterated his opinion that Judd's need for total knee replacement surgery was not related to her workplace fall. He also testified that he had reviewed additional records regarding Judd's medical history and that those records reinforced his opinion. In particular, Dr. Ruttle reviewed records from treatment Judd received in 1996. The 1996 records showed that Judd was experiencing pain in both knees, had first reported knee pain fifteen years earlier, and had undergone a total knee replacement on her left knee in 1996. The records further showed that Judd was diagnosed with early degenerative arthritis in her right knee in 1996 and had undergone an arthroscopic procedure on her right knee in 1986. Specifically regarding the 1996 treatment records, Dr. Ruttle testified:

A.  .... I'll read you that line again.  The patient stated that she had initially noted pain in her knees—plural—approximately fifteen years ago.

So she had been having knee pain for a long time.

[¶ 16]  Dr. Ruttle testified that he agreed with Dr. MacGuire's independent medical evaluation and explained the basis for his opinion that Judd's right knee total replacement surgery was unrelated to her fall at work:

A.  Well, as previously outlined, this patient had significant pre-existing degenerative osteoarthrosis in the right knee, that had in the past affected the same process that affected the left.

She had had a prior history of arthroscopy in the right knee—which she didn't fess up to, by the way, with me.

She had ongoing complaints of right knee pain documented as far back as 1996.

Sustained a minor fall which at most, if you want to look at the MR, resulted in a bone bruise on the tibia and femur.  That did not result in the need for a total knee arthroplasty.  That pathology was there the day that patient hit the ground.  And that's what resulted in the need for the total knee.

[¶ 17]  On cross examination, Dr. Ruttle explained his position further with respect to his conclusions on causation and if and when Judd would have eventually required surgery had she not sustained her work injury.

A.  So I'm not sure exactly what she injured.

Again, I'm trying to be as concise as I can in the answer.  But it appears to me that even Dr. Murphy acknowledged that the—that the meniscus was torn and had—and, in his opinion, represented an acute—or excuse me, didn't represent an acute injury, but appeared to represent more of a chronic pathology.

So I'm not a hundred percent sure what was being treated there.

Q.  But according to all these records that Doug has provided to you, and when you saw her—

A.  Uh-huh.

Q.  —even though she was feeling some pain with weather, isn't it a fact that she essentially was working full-time and not in extreme pain prior to this fall?

A.  That is correct.

Q.  And so again, would that fall have aggravated that pre-existing condition, to the point where she was not able to work and not able to function?

A.  I don't think so.

Q.  Well, how would you evaluate then the fact that she was working and essentially pain-free before and then fell and then was not pain-free after that and consistently could not work up until the total knee replacement?

A.  Well, sure.  But—you know, she's got this pre-existing pathology in there, and then she fell.  And then only objective—additional objective finding that you could really find that wasn't based on a chronic change was this bone bruise.  So maybe there was a bone bruise in there, but that bone bruise sure didn't require total knee replacement.

The patient had—again, you know, not to beat the—the horse to death.  But she clearly had pre-existing pathology in that knee that was similar to the other side.

So what happened there, I don't know.

But was this total knee required on the basis of this injury?  Of course not.  It was all pre-existing, very significant degenerative changes for which it was noted the patient was mildly symptomatic.  She had pain with weather changes and had had symptoms it sounds like going back to 1996.

So I can't come to any other conclusion.

Q.  That there is a pre-existing condition, prior to the fall.

A.  Yeah.  And that it was symptomatic.  And I'm not sure that this injury rendered all that pathology symptomatic.  I don't know.

Q.  You can't testify to that, then.

A.  No.

Q.  You had indicated that she would need a total knee replacement on the right leg at some point; is that correct?

A. That is correct.

Q. Can you tell us when she would have needed that?

A. Probably not.

[¶ 18] Judd presented the deposition testimony of her treating physician, Dr. Murphy. Dr. Murphy testified that he agreed with Drs. Ruttle and MacGuire that Judd's right knee degenerative osteoarthritis was longstanding and preexisting, but disagreed that the condition was not materially aggravated by Judd's work injury.

Q. According to Dr. Ruttle—in his report, he felt that the patient's current problems appear unrelated to the original work injury.

In your medical opinion, could you give us your—

A. Well, I—I think what he's referring to is the fact that she had preexisting arthritis in the knee joint that would not have appeared on x-ray in the short period of time before her injury and when she saw me.

So there were underlying—which were minimally symptomatic to her; a little achiness and soreness, by her history, when the weather changed.

And so I think what he is trying to say is, Murphy is doing a total knee replacement because she has degenerative arthritis, and her work injury did not cause the degenerative arthritis.

And I—strictly speaking, I think that is true. She had arthritis before the work injury. However, her experience of it and symptomatically and functionally she was working, she was going along with her life and functioning at a high level, and she fell on it and—and then she had symptoms. Whether this was the straw that broke the camel's back and the previous 400 million straws did not break the camel's back, and this was the one that did, is an issue of apportionment. But clearly she had significant problems afterwards.

The findings on x-ray, MRI, and even arthroscopy may have represented chronic degenerative changes of the knee. However, her level of function prior to this was excellent, without—as far as I know—any visits to doctors about knee arthritis.

And I'm not sure what the specific pathology in her knee was that was—that was aggravated or caused by the fall. But clearly she had significant symptoms after that.

Q. So in your medical opinion, with some degree of medical probability, would you then say that the fall materially aggravated the degenerative condition in her right knee?

A. . I would say that, based on her symptoms. And, unless you're willing to discount the entire history given by her, I think you have to accept that there was some material aggravation of her condition caused by the fall.

Now, having seen the inside of her knee, I can't point to you which finding in that knee was materially aggravated by the fall. And for all I know, the interior of that knee may have looked exactly the same the day before the fall. I don't know.

But certainly symptomatically—and her ability to use the knee—was materially aggravated by the fall.

Q. And are you basing your opinion then on the history that you have and the experience and knowledge you have of this patient?

A. Yes.

Q. And that would be based on that fact that she working a full-time job and had had no previous symptoms?

A. Had minimal previous symptoms.

[¶ 19] In his deposition testimony, Dr. Murphy also addressed the issue of the inevitability and timing of Judd's total knee replacement surgery. He testified:

Q. Without the fall, if you would have seen Lois Judd's x-rays, MRI of the knee, and she was at work and functional, as she was prior to the fall, would you have told her she needed a total knee replacement?

A. No. I—I do that based on symptoms of pain. I do total knee replacements for symptoms of pain and decreased function.

Q. And is there any way that you would have known if and when there would have been a need for a total knee replacement?

A. Without her telling me? No.

Q. Without the symptoms of pain and inability to use the knee?

A. That's correct. Without those symptoms, we would not be having the discussion.

Q. Okay. So in your medical opinion, with some degree of medical probability, did the fall accelerate her need for a total knee replacement?

A. I think that's probably fair, to say that. Yes.

Again, I think it was a material aggravation of a condition that, objectively looking at it, would certainly have, with the right clinical scenario, been suitable for a knee replacement. Even before the injury.

However, I don't do joint replacements—I don't think anybody does do joint replacements—on joints just because they are arthritic. They have to be highly symptomatic and function limiting.

Q. In your medical opinion, with some degree of medical probability, was what brought Ms. Judd's knee to a symptomatic condition the fall?

A. Yes.

[¶ 20] Dr. Murphy gave the foregoing testimony before having reviewed the records of Judd's 1996 treatment for knee pain in both knees. A second deposition of Dr. Murphy was taken after he had an opportunity to review the 1996 records. After reviewing the 1996 records, Dr. Murphy testified that those records did not change his opinion.

Q. Before we move on to Dr. Ruttle's deposition, I guess my question to you, Dr. Murphy, is in reviewing these old records, has it changed your opinion—let me look for sure. When we took your deposition, you were indicating that you felt that the right knee was materially aggravated by the fall at work. After you reviewed these records and have this additional information, has it changed your opinion regarding how this fall, work fall, has impacted Lois' right knee?

A. I think my opinion was based on the history given to me by the patient regarding her symptoms. Clearly, the records from Dr. McCarthy detail a significant arthritic condition preexisting in her right knee. And, indeed, she had—he describes a surgery ten years prior to that, which would be 1986, so this is a condition that has given her some level of symptoms and problem also as far back as 20 years ago.

However, she was working full-time, had no significant complaints—at least I have not seen evidence that she had sought medical care—and she hadn't seen me for any problems in her right knee prior to the injury. So I would stand by the fact that there was at least significant symptomatic material aggravation in her right knee, which I may not be able to, by any means, point a finger to in terms of her independent, underlying degenerative changes, and I may not be able to cull out what was acute and what was chronic.

However, by history, she was able to work full-time. While it is possible she may have had symptoms, they were not symptoms that had ever brought her to my attention for her right knee problems prior to the injury.

Q. And in looking at your previous deposition, you—not only that, but your records, medical records, after looking at the knee and doing the surgeries, you were aware that there was degeneration in the knee?

A. Absolutely.

Q. And so your opinion was not based totally on the fact that it was a pristine knee. You were fully aware that there has been some degeneration?

A. Fully aware both from her X–rays, her knee arthroscopy, and findings on open arthrotomy that she had a preexisting degenerative condition.

Q. As far as the history and any of the records we provided you, has there been anything additional or anything that would change your opinion of the fact that she was able to work and continued to be fully functional between the '96 surgeries or the 96 medical records and up to the point of the fall?

A. I would accept that as a point of history. I cannot personally witness that, but

certainly I could witness she was working in a very demanding environment, North Platte Physical Therapy, prior to the injury.

Q. Okay, I want to talk to you a little bit about Dr. Ruttle's deposition. He certainly has a different opinion. He feels that the fall is—was not the reason for—excuse me, that the fall did not cause the problem, and that the subsequent surgery was not as a result of the fall. Have you had a chance to review his deposition, Dr. Murphy?

A. I have.

Q. And in some of the questions that were asked Dr. Ruttle that he identifies as important, I think you've already discussed, but I want to talk to you about his belief that she was at the endstage degenerative condition at the time of the fall. How would you evaluate her knee?

A. I would certainly say that she had significant and severe degenerative joint disease in her knee, which predated the fall. And the presence of that degenerative joint disease, certainly made her more susceptible to even a relatively minor injury, pushing her over the edge. But I would not contest that she had serious and severe underlying degenerative joint disease in her knee.

However, by history and by my own experience, she worked—was able to go to work full-time in a relatively physically demanding environment as a physical therapy aid[e] at a very busy physical therapy office.

[¶ 21] In his second deposition, Dr. Murphy also testified again concerning the inevitability and timing of Judd's total knee replacement surgery and contrasted his views with those of Drs. Ruttle and MacGuire.

A. I would not argue with the contentions of either Dr. M[a]cGuire or Dr. Ruttle that this fall did not cause the arthritis. I agree with that. The arthritis was preexisting for the whole host of reasons and well delineated in that article, and described by both Dr. Ruttle and Dr. M[a]cGuire. And I would make no contention that her arthritis was caused by the fall.

However, I do total knee replacements for symptomatic—for symptoms of knee pain. Most of the time, those symptoms are caused by severe degenerative arthritis, sometimes posttraumatic arthritis, sometimes rheumatoid arthritis, sometimes mild or moderate arthritis with severe pain. The reason to do a knee replacement is to relieve pain. While I can't ontologically recreate the reasons why she had pain in her knee after that fall, she clearly had—by history and by her report—an inability to continue the level of activity that she had prior to the fall. Whether the fall was the straw that broke the camel's back after truck loads of straws were loaded on the camel's back and one additional straw broke the camel's back, that is a matter for the division and the hearing officer to decide.

In my view, I have to call them as I see them and play the hand I'm dealt, and the hand I was dealt was a woman who had difficulty walking on her knee after a fall at work with preexisting degenerative arthritis that had previously allowed her to fully function.

* * * *

Q. The other thing that I think has come up and—with Dr. M[a]cGuire and Dr. Ruttle is the fact that Dr. M[a]cGuire clearly states that she believes there would have been a knee replacement very shortly regardless of the fall, and Dr. Ruttle follows along with that. And I believe we discussed this in your previous deposition, and I asked you to tell me your time line on that. Can you give me a time line?

A. I'm very sure I did not commit to that. As I am amazed at the difference in individual people in how much arthritis they tolerate. And how—how many times I have seen patients with absolute polished bone-on-bone, which must have been there for years and years and years, and they come in and tell me—tell me it started to get a little sore last month, and now they were having trouble walking. So I'm very reluctant to commit to condemning people to a knee replacement based on the appearance of X-rays.

Q. In your opinion you're unable to predict when she would have been—

A. I think it's a reasonable prediction to say it is likely in someone who has bone-on-bone cartilage wearing their knee, that they will at some point need a knee replacement. I think it's very difficult without careful history or knowing the patient to predict when that is going to be.

[¶ 22] The testimony of Judd and Charles Mangus, her supervisor, was in keeping with Dr. Murphy's understanding of Judd's symptoms and functioning before her fall. Mr. Mangus testified that Judd was performing all duties of a physical therapy aide, without restriction, before her fall. Judd likewise testified that before moving to Wyoming a month before she began working in her present position as a physical therapy aide, she had worked seventeen years for a WalMart in Texas performing cashier and stocking duties. Judd testified that before her recent fall, the only time she had taken off from work for knee problems was in 1996 when she underwent her left knee total knee replacement surgery. Judd further testified that before her fall she was working forty hours per week, "doing fine," and that her right knee "ached a little bit when it was cold."

[¶ 23] Following the hearing, the Medical Commission issued its Findings of Fact, Conclusions of Law, and Order of Medical Commission Hearing Panel. The Medical Commission denied benefits for Judd's right knee total knee replacement surgery. In so ordering, the Medical Commission made the following findings:

9. .... This Panel notes, however, that Dr. Murphy was given an incomplete and inaccurate medical history from Ms. Judd regarding her prior right knee pathology. Dr. Murphy also agreed that he had never seen the medical records from Ms. Judd's prior left total knee replacement or other procedures.... Dr. Murphy also conceded that, even without the fall, with the pathology in Ms. Judd's knee, he would, "... start to probably think about a knee replacement." ....

* * * *

In addition, this Panel finds that Dr. Murphy's opinion is against the greater weight of the medical evidence and unduly minimizes the level of preexisting pathology in Ms. Judd's right knee and we find that the fall did **not** amount to a material or substantial aggravation of her preexisting condition. Ms. Judd had a **significant** preexisting condition that was highly likely to require a total knee replacement procedure without the contribution of the fall. We also note that the Division fully compensated Ms. Judd for the acute injury that likely occurred to her meniscus as a result of the fall and offered her a physical impairment award for that aspect of her injury. Ms. Judd had been on the job for approximately three months, and we also find that the fall was a relatively minimal incident and we agree with Dr. Murphy when he confirmed in his deposition that a fall is generally not a triggering mechanism for a total joint replacement....

* * * *

11. This Panel finds that Ms. Judd had an extremely significant preexisting medical condition in her right knee at the time of the work injury. The medical records that were generated by Dr. McCarthy, who performed the left total knee replacement in 1996, clearly show that Ms. Judd had a prior surgical intervention on her right knee, and that fact was not shared with her present surgeon. Although Ms. Judd claims loss of memory due to a January 2006 stroke, it is apparent that her memory was functioning adequately regarding other historical medical measures that had been taken. This Panel also finds that Ms. Judd did **not** sustain a material or substantial aggravation of her preexisting condition as a result of the work injury on November 8, 2006. The contribution of the significant preexisting condition to the total knee replacement was far more considerable than the relatively minor fall that occurred on that date. In addition, it appears that the Division provided reasonable acute care and treatment, including the arthroscopic procedure that was originally provided by Dr. Murphy, and as a result has met its obligation regarding the work-related portion of Ms. Judd's injury.

We further find that Ms. Judd's significant preexisting condition would have inevitably led to the need for a right total knee replacement regardless of the work injury on November 8, 2006.

(Emphasis in original.)

[¶ 24] During the course of the proceedings before the Medical Commission, Judd objected to the Division's referral of the contested case to the Medical Commission. Judd contends that in the absence of agreement by the parties, a referral to the Medical Commission was not authorized by statute, and the Medical Commission therefore had no jurisdiction to hear this matter. The Medical Commission rejected Judd's jurisdictional argument, concluding that the issue in this matter was a medically contested issue properly referred to the Medical Commission pursuant to Wyo. Stat. Ann. § 27–14–616.

## DISCUSSION

### *Standard of Review*

[¶ 25] On appeal from a district court's review of an agency decision, we afford no deference to the district court's decision. Rather, we review the case as if it came directly from the agency. *Straube v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 66, ¶ 13, 208 P.3d 41, 46 (Wyo.2009); *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo. 2008); *McIntosh v. State ex rel. Wyo. Med. Comm'n*, 2007 WY 108, ¶ 8, 162 P.3d 483, 487 (Wyo.2007). As in all administrative proceedings, the scope of our review is governed by the factors specified in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009), which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

\* \* \* \*

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 26] We explained the proper application of these standards in *Dale*, ¶¶ 20–26, 188 P.3d at 560–62. In short, we defer to an agency's findings of fact if supported by substantial evidence. *Id.*, ¶ 22, 188 P.3d at 561. We will not substitute our judgment for that of the agency if the agency's decision is reasonable under the circumstances. *Id.* We review an agency's finding that the burdened party failed to prove all the elements of his claim to determine "whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole." *Id.*; *see also Langberg v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 39, ¶ 10, 203 P.3d 1098, 1101 (Wyo. 2009); *Horn–Dalton v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 14, ¶ 7, 200 P.3d 810, 813 (Wyo.2009).

[¶ 27] Finally, we review an agency's conclusions of law *de novo*. *Straube*, ¶ 14, 208 P.3d at 47; *Dale*, ¶ 26, 188 P.3d at 561. In particular, the interpretation and application of statutes are questions of law which this Court reviews *de novo*. *Chavez v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2009 WY 46, ¶ 11, 204 P.3d 967, 970 (Wyo.2009). Likewise, questions regarding jurisdiction are questions of law reviewed *de novo*. *Routh v. State ex rel. Wyo. Workers' Comp. Div.*, 952 P.2d 1108, 1114 (Wyo. 1998).

### Jurisdiction

[¶ 28]  Judd contends that the Division improperly referred her case to the Medical Commission.  Specifically, Judd argues that because she did not request or agree to the referral of her case to the Medical Commission, pursuant to Wyo. Stat. Ann. § 27–14–616(e), the Medical Commission lacked jurisdiction to hear this contested case.  We disagree.

[¶ 29]  The option of the parties to agree, pursuant to Wyo. Stat. Ann. § 27–14–616(e), to have a contested case or issue referred to the Medical Commission is only one of the methods by which the Medical Commission may attain jurisdiction over a matter.  The Division itself has authority to directly refer medically contested matters to the Medical Commission for hearing.  Wyo. Stat. Ann. § 27–14–616(b)(iv) (LexisNexis 2009).  On appeal, Judd has not suggested that this case does not present a medically contested issue, and we therefore conclude that the Division properly referred this case to the Medical Commission after the OAH returned the case to it.

[¶ 30]  We also find unpersuasive Judd's suggestion that once she had undergone surgery without preauthorization, the issue was moot and the Medical Commission lost jurisdiction over the matter.  The statute authorizing the referral of a contested case to the Medical Commission provides that following referral to the Medical Commission, the hearing panel shall have jurisdiction to decide all issues relating to the employee's written notice of objection.  Wyo. Stat. Ann. § 27–14–616(b)(iv) (LexisNexis 2009).  Regardless of whether the issue was preauthorization of Judd's surgery or compensation to cover that surgery after the fact, the same medically contested issues arising from Judd's objection to the Division's denial of benefits remained to be resolved.  The Medical Commission properly retained jurisdiction over the contested case.

### Material Aggravation of Preexisting Condition

[¶ 31]  The law governing a claimant's burden of proof for claims related to a preexisting condition is well established. We summarized the applicable principles in *Ramos v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY 85, ¶¶ 17–18, 158 P.3d 670, 676–77 (Wyo.2007):

> In order to be eligible to receive worker's compensation benefits, a claimant must have sustained an "injury" as defined by Wyo. Stat. Ann. § 27–14–102(a)(xi)(LexisNexis 2001).  " 'Injury' means any harmful change in the human organism other than normal aging ... arising out of and in the course of employment while at work...."  To demonstrate that an injury arose out of the course of employment, the claimant must establish a causal connection between the work-related incident and the injury.  *Hanks v. City of Casper*, 2001 WY 4, ¶ 6, 16 P.3d 710, 711 (Wyo.2001).  The claimant bears the burden of proving this causal connection by a preponderance of the evidence.  *Clark v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2001 WY 132, ¶ 19, 36 P.3d 1145, 1150 (Wyo.2001).  "A 'preponderance of the evidence' is defined as 'proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence.' "  *Matter of Workers' Compensation Claim of Thornberg*, 913 P.2d 863, 866 (Wyo.1996) (quoting *Scherling v. Kilgore*, 599 P.2d 1352, 1359 (Wyo. 1979)).

*Anastos v. General Chemical Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 665–66 (Wyo.2005).

> "Injury," as the term is defined in Wyo. Stat. Ann. § 27–14–102(a)(xi) (LexisNexis 2003) of the Wyoming Workers' Compensation Act, does not include any injury or condition preexisting at the time employment begins with the employer against whom a claim is made.  However, "in Wyoming an employer takes the employee as he finds him." *Lindbloom v. Teton International*, 684 P.2d 1388, 1389 (Wyo.1984).  If an employee suffers from a preexisting condition, that employee may still recover if his employment substantially or materially aggravates that condition.  *Id.*  In *Lind-*

*bloom,* we cited with approval the widely accepted treatise, Larson's Workmen's Compensation Law, for the proposition that:

Preexisting disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought.

1 Larson's Workmen's Compensation Law, § 12.20, p. 273–276. Larson goes on to say:

Since the rule of law stated at the beginning of this section is so widely accepted, in practice most of the problems in this area are medical rather than legal. * * * * It will be found then that denials of compensation in this category are almost entirely the result of holdings that the evidence did not support a finding that the employment contributed to the final result. Whether the employment aggravated, accelerated, or combined with the internal weakness or disease to produce the disability is a question of fact, not law, and a finding of fact on this point ... based on any medical testimony ... will not be disturbed on appeal.

*Id.,* § 12.20, p. 313–16.

*Boyce v. State ex rel. Wyoming Workers' Safety & Comp. Div.,* 2005 WY 9, ¶ 10, 105 P.3d 451, 454–55 (Wyo.2005).

Expert opinion testimony ordinarily will be required to establish the link between the employee's work activity or injury and the preexisting disease or condition; the expert need not state with specificity that the work activities or injury materially or substantially aggravated, accelerated, or combined with the preexisting disease or condition to necessitate the medical treatment for which compensation is sought; and the expert need not apportion between the work activity or injury and the preex-

isting disease or condition; the relative contribution of the work activity or injury and the preexisting disease or condition is not weighed. *Boyce,* ¶¶ 11, 16, 105 P.3d at 455, 456.

*Ramos,* ¶¶ 17–18, 158 P.3d at 676–77; *see also Straube,* ¶ 15, 208 P.3d at 47–48; *Montoya v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2009 WY 32, ¶ 22, 203 P.3d 1083, 1089–90 (Wyo.2009).

[¶ 32] At the outset of our discussion, it is helpful to point out what is truly in dispute in this matter and what is not. Neither Judd nor her treating physician disputes the preexisting degenerative arthritis in Judd's knee or the severity of that preexisting condition. Likewise there is no dispute among the medical experts who examined and evaluated Judd as to the cause of her degenerative arthritis. Neither Judd nor her treating physician suggests that her fall in the workplace caused her degenerative condition.

[¶ 33] Additionally, there is no dispute in the evidence that Judd's job as a physical therapy aide was physically demanding or that for the approximately three months before her work-related fall, Judd was working fulltime in that position without restriction. Similarly, there is no dispute that in the approximately seventeen years before Judd began her job as a physical therapy aide, she worked for WalMart performing cashier and stocking duties and had taken time off for her knee condition only in 1996 when she underwent a total knee replacement on her left knee.

[¶ 34] Regarding the work accident itself, there is no dispute that on November 8, 2006, Judd tripped in the workplace, fell to the ground and experienced immediate pain and swelling in her right knee. Finally, there is no dispute that prior to her workplace fall, Judd experienced only minor aching in her right knee with changes in the weather, and after the fall, she was in pain, could not put weight on the knee and did not regain function in the knee until the total knee replacement surgery was performed.[1]

---

1. The Medical Commission suggested in its findings that Judd's testimony should be given less weight because she did not disclose to her treating physician or the independent evaluators a

1986 arthroscopic procedure on her right knee, which she claims to have forgotten while at the same time remembering other details of her medical history. We believe the Commission's

[¶ 35] The point on which the experts disagreed is whether Judd's fall in the workplace materially aggravated Judd's preexisting arthritis in her right knee. Again, it is important to point out that the experts did not disagree on the facts relating to this question, but instead only on the conclusions regarding causation to be drawn from those facts. Judd's treating physician, Dr. Murphy, concluded that because Judd had only minor aching with cold weather before her fall and debilitating pain and loss of function after her fall, the fall had materially aggravated her degenerative arthritis. The independent evaluators, Drs. Ruttle and MacGuire, did not dispute those basic facts, but they concluded that because the fall did not change the underlying knee pathology, that is physically alter the degenerative arthritis, and because Judd's total knee replacement surgery was inevitable, there was no material aggravation of the preexisting condition.

[¶ 36] The Medical Commission denied compensation for Judd's total knee replacement surgery, concluding it was inevitable and the "contribution of the significant preexisting condition to the total knee replacement was far more considerable than the relatively minor fall that occurred on that date." By employing that rationale for denying Judd's claim, the Medical Commission misapplied the law regarding the compensability of injuries resulting from aggravation of a preexisting condition. First, the Commission committed a legal error when it relied upon the conclusions of Drs. Ruttle and MacGuire that no material aggravation of Judd's condition can be found because there

was only an increase in symptoms and not a change in the underlying pathology of the preexisting condition. Wyoming law does not require a change in the underlying pathology to find a material aggravation. What it requires is that the work injury combine with the preexisting condition to create the present disability and need for treatment. *See Langberg,* ¶ 28, 203 P.3d at 1104 (holding injury compensable where work injury did not cause Kienbock disease but rendered dormant condition symptomatic, creating need for surgery); *Montoya,* ¶¶ 23–25, 203 P.3d at 1090 (holding fall at work increased symptoms of preexisting traumatic brain injury and created compensable disability); *Ramos,* ¶ 26, 158 P.3d at 679 (holding facial work injury did not create periodontal disease but combined with it to necessitate compensable dental treatment); *Salas v. General Chemical,* 2003 WY 79, ¶¶ 19–22, 71 P.3d 708, 715–16 (Wyo.2003) (holding knee surgery compensable where work injury aggravated pain of preexisting degenerative knee condition).

[¶ 37] This Court recently decided a case that presented facts similar to this case. *See State ex rel. Wyo. Workers' Safety & Comp. Div. v. Slaymaker,* 2007 WY 65, 156 P.3d 977 (Wyo.2007). In *Slaymaker,* the claimant suffered from a preexisting lower back condition, including bulging discs, annular tears and arthropathy, a degenerative condition. *Id.,* ¶ 7, 156 P.3d at 980. Following a work injury the claimant suffered when trying to move an all-terrain vehicle, the OAH awarded benefits for a torn muscle and ligament damage but denied treatment for the preex-

focus on this omission was misguided. First, the 1986 arthroscopic procedure was irrelevant to the medical picture. With or without that procedure, Judd had severe bone-on-bone degenerative arthritis in her right knee, and it was that degenerative condition that was the basis for the opinions of the independent evaluators on whose judgment the Commission relied in reaching its decision. Second, given the confused state of the 1996 medical records, with the word "right" repeatedly crossed out and replaced with the word "left," the records hardly represent definitive proof that Judd ever underwent an arthroscopic procedure on her right knee. It is entirely possible that the reason Judd does not recall the procedure is that it never happened and the notation in the record is a typographical error.

That said, we do not substitute the Commission's credibility determinations with our own. The weight the Commission chose to give Judd's testimony ultimately does not affect the outcome of this matter. Dr. Ruttle, whose opinion the Medical Commission gave the greatest weight, acknowledged and accepted as accurate in forming his opinion, that Judd was able to work and had minimal aching with weather changes before her fall and debilitating pain and loss of function in her right knee after her fall. Additionally, Judd's ability to work fulltime without restriction in a physically demanding job for approximately three months before her fall was confirmed by the testimony of her supervisor, Charles Mangus.

isting conditions. *Id.* We reversed, explaining:

> Moreover, other evidence presented at the hearing established, without contradiction, that Mr. Slaymaker's physical condition deteriorated significantly following the accident. Prior to May 29, 2003, Mr. Slaymaker was suffering from lower back pain and had sought medical treatment for that condition. However, he was able to manage his pain sufficiently to continue working fifty hours per week at his physically demanding job. Following the ATV accident, he was in severe pain, could no longer work, and needed assistance getting out of his truck.

*Slaymaker,* ¶ 23, 156 P.3d at 985.

[¶ 38] This case presents a nearly identical situation. It is undisputed that Judd's condition changed dramatically after her work injury. Before her fall, she was working forty hours per week without restriction. After her fall, she was unable to put weight on her knee or work. Drs. Ruttle and MacGuire mistakenly concluded that this change did not represent a material aggravation of Judd's preexisting condition, and the Medical Commission erred in relying on those opinions to deny benefits for the aggravation of Judd's preexisting condition.

[¶ 39] The Commission likewise erred in relying on the conclusions of Drs. Ruttle and MacGuire that no material aggravation of Judd's condition can be found because surgery to treat Judd's preexisting condition was inevitable. We have rejected the inevitability of injury or surgery as a basis to deny compensation. *See Straube,* ¶ 17, 208 P.3d at 48 (holding employer takes an employee as he finds him and it is not material that injury could have occurred at anytime); *State ex rel. Wyo. Workers' Comp. Div. v. Roggenbuck,* 938 P.2d 851, 853 (Wyo.1997) (holding surgery to treat preexisting condition compensable where "work effort brought the need for surgery to a head and forced the surgery to be done at this time").

[¶ 40] Finally, the Medical Commission erred in comparing the relative contributions of the work injury and the preexisting condition as a basis to deny compensability of Judd's present disability and need for surgery. The Commission's conclusion that the "contribution of the significant preexisting condition to the total knee replacement was far more considerable than the relatively minor fall that occurred on that date," is a clear statement of apportionment, and we have held that such apportionment is not permitted by Wyoming statute. *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Faulkner,* 2007 WY 31, ¶ 18, 152 P.3d 394, 399–400 (Wyo.2007).

## CONCLUSION

[¶ 41] The evidence is undisputed that despite Judd's preexisting degenerative condition, she was able to work fulltime without restriction before her work injury, and after her work injury, she suffered debilitating pain that prevented her from putting weight on her knee and from working. The work injury brought Judd's need for surgery to a head, and the Medical Commission erred in denying benefits for the surgery. The case is reversed and remanded for the award of appropriate benefits.