# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 52

OCTOBER TERM, A.D. 2014

**March 31, 2015**

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF
HAROLD F. VANDRE, AN EMPLOYEE
OF MCMURRY READY MIX
COMPANY:

HAROLD F. VANDRE,

Appellant
(Petitioner),

v.                                                                    S-14-0176

STATE OF WYOMING, ex rel.,
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Goshen County*
*The Honorable Keith G. Kautz, Judge*

*Representing Appellant:*
Herbert K. Doby, Torrington, WY.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; and Robert J. Walters, Senior Assistant Attorney General.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    In 2007, Harold F. Vandre suffered compensable work injuries when he was run over and dragged by an asphalt paver, including loss of his right leg, rib fractures, a collapsed lung, and a closed head injury.  In 2012, Mr. Vandre sought worker's compensation benefits to cover medical expenses related to his chronic obstructive pulmonary disease (COPD), and those benefits were denied on the basis that the COPD was unrelated to Mr. Vandre's work injuries.  The Office of Administrative Hearings (OAH) upheld the denial of benefits, finding that Mr. Vandre had not met his burden of showing that his work injuries materially aggravated his preexisting COPD.  Mr. Vandre appealed to the district court, which affirmed the OAH decision.  We reverse.

## ISSUES

[¶2]    Mr. Vandre states the issues on appeal as follows:

> 1.    Was the agency's decision supported by substantial evidence in denying Appellant's claims for medical benefits filed in connection with Appellant's pre-existing and continuing COPD issues that were aggravated, accelerated, or exacerbated by his original compensable work injury with McMurry Ready Mix Company?
>
> 2.    Did the agency act arbitrarily and capriciously in denying Appellant's claims for medical benefits filed in connection with his pre-existing and continuing COPD issues that were aggravated, accelerated, or exacerbated by his original compensable work injury with McMurry Ready Mix Company?

## FACTS

### A.    Work Injury and Treatment

[¶3]    On August 23, 2007, Harold Vandre, who lives in Torrington, Wyoming, was working for McMurry Ready Mix Company as a heavy equipment operator on a project near Pinedale, Wyoming.  On that morning, Mr. Vandre was operating a dozer but had exited the dozer and was walking along the shoulder of the road on which he was working.  While walking along the shoulder, he was struck by an asphalt paver and, with his right leg caught in the paver, was dragged approximately 150 feet.  Mr. Vandre's right leg was damaged to the extent that it required amputation just below the pelvis.  He also suffered rib fractures on the right side, a collapsed right lung, and a closed head injury.

1

[¶4]  Mr. Vandre was given critical care at the Pinedale Medical Clinic and then transported by helicopter to the Eastern Idaho Regional Medical Center.  He was discharged several weeks later on October 3, 2007, with his attending physician, Dr. Brad D. Smith, commenting as follows on Mr. Vandre's hospital course and discharge:

> This 48-year-old white male was admitted through the Emergency Room on 08/23/2007, status post an industrial accident where the patient was working on an asphalt machine and was accidentally pulled into the asphalt machine by his right lower extremity.  He was treated at the scene and taken to the Pinedale Clinic where initial stabilization attempts were made.  The patient was then transported via helicopter to Eastern Idaho Regional Medical Center.  His initial resuscitation included multiple packed red blood cell transfusions as well as an emergent trip to the Operating Room.  He had closure of a scalp laceration, placement of right chest tube, and completion of his traumatic amputation.  Postoperatively, the patient stabilized relatively quickly.  He had been treated with mechanical ventilation, intravenous fluids, and electrolytes as well as pain medication and antibiotics as well as right tube thoracostomy.  Within a few days, he was able to be extubated, but required a trip to the Operating Room for debridement and closure of his right lower extremity stump as well as placement of a wound vac.  Subsequently, his right lung was almost completely expanded and his right chest tube was removed, however, very soon he had a recollapse of his right lung requiring replacement of right chest tube.  The patient had a persistent air leak and developed a fluid collection in the base of the right lung.  Cardiovascular and thoracic consultation was obtained.  It was felt that he should undergo decortication of the right pleural cavity.  This was performed by Dr. Denyer.  Unfortunately, the majority of the patient's hospitalization was due to the fact that he had a persistent air leak for several weeks postoperatively and required ongoing hospitalization for monitoring of his chest tubes by both cardiovascular and thoracic surgery and myself.  The patient had demonstrated steady progress in terms of his physical therapy and ability to ambulate and was also seen by a prosthetist who initiated the process for fitting him for a prosthesis.  After several weeks, his air leak finally stopped and his chest tubes were able to be removed.  His recovery

was obviously compounded by his significant chronic obstructive pulmonary disease and history of tobacco abuse. The patient was ultimately discharged on 10/03/2007. We arranged for home health in Torrington, Wyoming for ongoing wound care and follow-up. Further instructions were obtained from Dr. West regarding the patient's right lower extremity stump wound care. The patient is maintained on home O2 at 1-2 liters per nasal cannula which he was on prior to his hospitalization. . . .

[¶5]    Before Mr. Vandre's accident, his primary care physician was Dr. Paul G. Lehmitz. Among the conditions for which Dr. Lehmitz treated Mr. Vandre before his accident was chronic COPD, which is "basically an air trapping in the lungs, an inability to move air out very well, somewhat similar to asthma except that asthma is more readily reversible." A January 2007 respiratory analysis showed Mr. Vandre's COPD to be moderate to severe with Mr. Vandre's "degree of functional impairment" rated as "severe."

[¶6]    In January 2007, Mr. Vandre was prescribed an Albuterol inhaler and "Oxygen 1.5 liters at night." In a May 25, 2007 record, Mr. Vandre's prescription for oxygen remained the same, and Dr. Lehmitz noted that he strongly encouraged Mr. Vandre to "use oxygen all of the time and stop smoking." In a July 31, 2007 note, a few weeks before the work accident, Mr. Vandre's prescription for oxygen again remained at 1.5 liters at night, and Dr. Lehmitz again urged Mr. Vandre to stop smoking.

[¶7]    Dr. Lehmitz saw Mr. Vandre twice after his accident and discharge from Eastern Idaho Regional Medical Center. On November 5, 2007, Mr. Vandre began seeing Dr. Millard Todd Berry as his primary care physician, and Dr. Berry remains Mr. Vandre's primary care physician.

[¶8]    Since Mr. Vandre's accident, he has continued to be treated for his COPD and pain associated with phantom limb syndrome. His continuing treatments have him on numerous medications, including prescriptions for oxygen, inhalers, and pain medications. Mr. Vandre has also been treated with Cipro for recurring right side lung infections, which his medical records attribute to the damage sustained in his 2007 work accident. Mr. Vandre's medical records also note the onset of depression in 2008, with a prescription for Zyprexa being added to his medications in January 2011. The Zyprexa was prescribed for depression and to assist with Mr. Vandre's weight, which on that date was measured at 119 pounds (on a just under six-foot frame).

[¶9]    In 2008, Mr. Vandre was diagnosed with sleep apnea, and was prescribed use of a CPAP device with an oxygen bleed. Dr. Berry explained:

Q. What's a CPAP, at night?

A. It's Continuous Positive Airway Pressure.

We use it to prop open the upper airways, the softer tissues, when people have sleep apnea, so that they don't stop breathing because of the obstruction from the soft tissues when they fall into deep sleep.

Q. Okay. What's the cause of sleep apnea?

A. It's varied.

Q. What are some of the causes?

A. Some people are just predisposed to it because of their physical build. Heavier people with thicker necks will tend to get it.

Medications frequently are a cause, especially if they are sedating medications.

Q. Do you have any indication in your treatment of Mr. Vandre that medications that he's taken can result – have resulted in the sleep apnea?

A. Very likely. I would have to look over the sleep study report. Frequently there are comments in there based on the structure of the sleep – or the sleep apnea that they diagnose him with.

. . . .

Q. In the impression section, about two-thirds of the way down, it says – well, what is a polysomnograph report? What do they do to get that?

A. Measure your sleep waves during your sleep, to see what stages of sleep you are even going into, and to see really what the sleep architecture is.

Sometimes you can delineate if you have medication effects or even as far as vitamin deficiencies.

If you drop into deeper sleep, if you tend to stop breathing they can delineate if you have sleep apnea, or how severe it is, or really which kind it is.

Q. Okay. And then it goes on to say that he has significant baseline hypoxemia?

A. Uh-huh.

Q. And that that hypoxemia could be a result of the sedative or narcotic administration.

A. Yes.

Q. Okay. Do you think it could be or it probably is?

A. In my opinion, I would say probably is.

4

[¶10] Also in 2008, around the same time that Mr. Vandre was diagnosed with sleep apnea, his medical records note that his frontal lobe damage from his head injury is "causing troubles." Mr. Vandre was experiencing difficulty with falling and seizure-like activity. A July 16, 2008 report from Dr. Joseph J. LoPresti, a neurologist, included the following comment:

> The patient will be obtaining a CPAP mask in order to prevent oxygen desaturations at night. Frankly the central apneas may be due to the large amount of medication he is on right now. There may be some interactions which are causing him to have respiratory compromise at night. Ativan at bedtime is not helpful in this case and should be eliminated. Medications at bedtime especially should be lowered. I will leave this up to Dr. Berry at this time. We will make some more suggestions after we get the results of these tests. This is quite a complicated issue, but a lot of the patient's difficulties may be related to medication effect.

[¶11] Mr. Vandre's 2012 medical records show that he continued to be treated for COPD, phantom limb syndrome, seizure activity, and sleep apnea, and that he remained on a number of prescribed treatments, including pain medications and CPAP with oxygen bleed. On March 7, 2012, Dr. Berry wrote a letter addressed "To Whom It May Concern," which stated:

> Harold never was found to be in need of nighttime oxygen nor was he found to be in need of any kind of pressure support while sleeping, until he had his accident 08/27/2007, whereupon he had a traumatic high-transfemoral amputation in a work-related injury. It may be that some of his medications are contributing to his state of sleep apnea and hypoxemia, but he would not be on those medications had he not had the accident. Please consider this when evaluating his obvious need for nighttime pressure support with oxygen when reviewing his case.

[¶12] On April 3, 2012, Dr. Berry saw Mr. Vandre for an office visit and included the following comment in his treatment notes:

> Letter was written in early March as to the reasoning behind his lung problems. He does have COPD which I believe is going to be long standing but I believe everything has been moved up regarding oxygen therapy and all of his other

breathing problems. I believe that he would not be on all of his breathing therapies that he has now if it had not been for the accident that he had when he had it.

## B.    Proceedings Below

[¶13] Shortly after Mr. Vandre's work accident in 2007, his employer filed an injury report with the Wyoming Workers' Compensation Division (Division), and the Division thereafter issued a final determination opening Mr. Vandre's case. The final determination identified the covered body parts as: right leg, ribs, right head, right low back (lumbar), and left foot, toe(s) or ankle. The record indicates that at some point Mr. Vandre was determined to be eligible for permanent total disability (PTD) benefits, but it does not otherwise detail the benefits paid for treatment of Mr. Vandre's work injury up until the present dispute.

[¶14] The present dispute stems from four final determinations issued by the Division denying coverage for medical treatments between March 1, 2012 and May 11, 2012. The amounts at issue in those final determinations are: $475.00; $103.00; $65.00; and $350.00. The bills and/or invoices for those treatments were not made a part of the record, but correspondence from Mr. Vandre's attorney to the Division indicates that the expenses are for oxygen, equipment related to the oxygen administration, and prescription inhalers. Each final determination informed Mr. Vandre: "Treatment of chronic obstructive pulmonary disease is disallowed, as it is unrelated to the work injury of August 23, 2007, to the right lower leg, ribs, head, low back, left foot, or chest."

[¶15] On May 18, 2012, Mr. Vandre requested a hearing on the denial of benefits for the respiratory treatments, and on June 19, 2012, the Division referred the matter to the OAH for an evidentiary hearing. On May 14, 2013, the OAH held a contested case hearing, and it reconvened on June 27, 2013, for receipt of the deposition testimony of Mr. Vandre's treating physician and for presentation of closing arguments. On July 19, 2013, the OAH issued its Findings of Fact, Conclusions of Law, and Order upholding the Division's final determinations. In so ruling, the OAH found and concluded that Mr. Vandre's COPD was a preexisting condition, that "[Mr.] Vandre's worsening COPD is a self-inflicted condition caused by his heavy smoking over many years," and that Mr. Vandre "did not prove the COPD symptoms he complained of in May 2012 were causally connected to his work-related injury of August 23, 2007."[1]

---

[1] We note that this case does not present a question of whether Mr. Vandre forfeited the right to worker's compensation benefits due to injurious practices, as provided for by Wyo. Stat. Ann. § 27-14-407 (LexisNexis 2013). While counsel for the Division made a brief reference to injurious practices in his closing argument before the OAH, the Division did not raise forfeiture as an issue in its disclosure statement, and the OAH made no findings concerning forfeiture.

[¶16]  Mr. Vandre filed a petition for review, and the district court affirmed, concluding that the OAH decision was supported by substantial evidence.  Vandre thereafter filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

[¶17]  This Court reviews a district court's decision on an administrative decision as though the case came directly from the administrative agency.  *Stevens v. State ex rel. Dep't of Workforce Servs., Workers' Safety & Comp. Div.*, 2014 WY 153, ¶ 30, 338 P.3d 921, 928 (Wyo. 2014) (citing *Hirsch v. State ex rel. Wyo. Workers' Safety & Comp. Div. (In re Worker's Comp. Claim)*, 2014 WY 61, ¶ 33, 323 P.3d 1107, 1115 (Wyo. 2014)).  Our review is governed by the Wyoming Administrative Procedure Act, which provides:

> (c)  To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> > (i)  Compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (ii)  Hold unlawful and set aside agency action, findings and conclusions found to be:
> >
> > > (A)  Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
> > >
> > > (B)  Contrary to constitutional right, power, privilege or immunity;
> > >
> > > (C)  In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
> > >
> > > (D)  Without observance of procedure required by law; or
> > >
> > > (E)  Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2013).

[¶18]   Under the Wyoming APA, we review an agency's findings of fact by applying the substantial evidence standard.  *Jacobs v. State ex. rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 8, 301 P.3d 137, 141 (Wyo. 2013); *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008).  Substantial evidence means relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  *Jacobs*, ¶ 8, 301 P.3d at 141; *Bush v. State ex rel. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005).  "'Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings.'"  *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo. 2011) (quoting *Bush*, ¶ 5, 120 P.3d at 179).

[¶19]   Under the substantial evidence standard, a hearing examiner has wide latitude to "determine relevancy, assign probative value, and ascribe the relevant weight given to the evidence presented," including medical evidence and opinion.  *Spletzer v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo. 2005) (citing *Clark v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 934 P.2d 1269, 1271 (Wyo. 1997)).  This Court will only overturn a hearing examiner's determinations if they are "clearly contrary to the great weight of the evidence."  *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 148, ¶ 16, 123 P.3d 143, 148 (Wyo. 2005) (quoting *Hurley v. PDQ Transp., Inc.*, 6 P.3d 134, 138 (Wyo. 2000)).  We recognize that a hearing examiner may disregard evidence found to be "evasive, equivocal, confused, or otherwise uncertain."  *Id.* (quoting *Krause v. State ex rel. Wyo. Workers' Comp. Div.*, 803 P.2d 81, 83 (Wyo. 1990)).  "If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test."  *Dale*, ¶ 22, 188 P.3d at 561.

[¶20]   Regarding a determination that an injured employee did not meet his burden of proof, we have stated:

> If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. … Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

8

*Worker's Comp. Claim of Vernon Bailey v. Wyo. ex rel. Dep't of Workforce Servs.,* 2015 WY 20, ¶ 11, 342 P.3d 1210, 1213 (Wyo. 2015) (quoting *Dale*, ¶ 22, 188 P.3d at 561).

[¶21] The arbitrary and capricious standard of review is used as a "safety net" to catch agency action that prejudices a party's substantial rights or is contrary to the other review standards, but is not easily categorized to a particular standard. *Jacobs*, ¶ 9, 301 P.3d at 141. "The arbitrary and capricious standard applies if the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law." *Id.* "'We review an agency's conclusions of law *de novo,* and will affirm only if the agency's conclusions are in accordance with the law.'" *Kenyon*, ¶ 13, 247 P.3d at 849 (quoting *Moss v. State ex rel. Wyo. Workers' Safety and Compensation Div.*, 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo. 2010)).

## DISCUSSION

[¶22] An employee's burden of proof in a claim for worker's compensation benefits is well established:

> A claimant for workers' compensation benefits must prove all of the essential elements of his claim by a preponderance of the evidence. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div'n*, 2011 WY 118, ¶ 14, 259 P.3d 1161, 1165 (Wyo. 2011); *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Slaymaker*, 2007 WY 65, ¶ 13, 156 P.3d 977, 981 (Wyo. 2007). "'This burden includes establishing the cause of the condition for which compensation is claimed and proving that the injury arose out of and in the course of employment.'" *Middlemass*, ¶ 14, 259 P.3d at 1165, quoting *Hanks v. City of Casper*, 2001 WY 4, ¶ 6, 16 P.3d 710, 711 (Wyo. 2001).

*Hayes v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 96, ¶ 14, 307 P.3d 843, 847 (Wyo. 2013).

[¶23] "Injury," as the term is defined in the Wyoming Worker's Compensation Act, does not include any injury or condition preexisting at the time employment begins with the employer against whom a claim is made. Wyo. Stat. Ann. § 27–14–102(a)(xi)(F) (LexisNexis 2013). This Court has also held, however, that "in Wyoming an employer takes the employee as he finds him." *Straube v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 66, ¶ 15, 208 P.3d 41, 47 (Wyo. 2009) (quoting *Lindbloom v. Teton Int'l*, 684 P.2d 1388, 1389 (Wyo. 1984)). An employee thus may recover for a preexisting condition if his employment "'aggravated, accelerated, or combined with the disease or infirmity' to produce the condition for which compensation is sought." *Hayes*,

¶ 14, 307 P.3d at 847 (quoting *Dutcher v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 10, ¶ 14, 223 P.3d 559, 562 (Wyo. 2010)).  We have further explained:

> [O]ur case law requiring a claimant to show his or her employment "materially or substantially aggravated" the preexisting injury does not require expert medical testimony specifically using the words "substantial or material." Rather, what our cases require is that the claimant show that work activities, rather than the natural progression of the condition, factors associated with ordinary daily living or some other non-work related factor, significantly aggravated the preexisting condition. The nexus between work activities and the aggravation ordinarily will be shown through expert opinion testimony. That is, expert medical testimony ordinarily will be required to establish the link between the worsening of the medical condition and the claimant's work activities, rather than some other factor. The materiality of the nexus ordinarily will be shown through evidence of the facts and circumstances surrounding the employment. Stated simply, the claimant is required to prove by a preponderance of all of the evidence that the work activities were a significant factor in the worsening of the preexisting condition.

*Bailey*, ¶ 16, 342 P.3d 1214 (quoting *Boyce v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 9, ¶ 16, 105 P.3d 451, 456 (Wyo. 2005)).

[¶24]  It is undisputed that Mr. Vandre suffered from COPD before his work accident. Mr. Vandre was therefore required to show that his 2007 work injuries aggravated, accelerated, or combined with his COPD to produce the condition for which he presently seeks compensation.  In an effort to meet his burden, Mr. Vandre presented medical records, the testimony of his wife, Carmen Vandre, and his own testimony.  He also presented the deposition testimony of Dr. Berry who opined that it is likely Mr. Vandre's work injuries materially exacerbated and accelerated the worsening of his COPD respiratory issues.  In response, the Division presented medical records and cross-examined Mr. Vandre's witnesses, but it did not have an independent medical examination (IME) performed or present expert medical testimony or opinions.

[¶25]  In concluding that Mr. Vandre failed to establish the required link between his work injuries and his respiratory issues, the hearing examiner found that Mr. Vandre's COPD was the same before and after his work accident and that to the extent his issues had been aggravated, that aggravation was due to Mr. Vandre's own behaviors.  The hearing examiner reasoned:

10

61.     As the Division's counsel noted, Vandre was prescribed oxygen prior to his work accident, and the same prescription was provided for Vandre after his work accident. Vandre was also using inhalers prior to his work accident and continued to use those inhalers after his work accident. Thus, there is a clear before-and-after picture presented in this case which revealed that, while Vandre suffered injury to his right lung as a result of his work accident, his treatment for COPD remained the same. This Hearing Examiner has read the medical records closely. It is true that Vandre suffered lacerations to his right lung, which caused his lung to collapse. The lung was then reinflated, collapsed again, and was again reinflated, with success. Decortication of the interior chest wall was necessary to achieve the second reinflation. There was no evidence that activity resulted in a worsening of Vandre's preexisting COPD.

62.     Further, the evidence established very clearly that Vandre has been his own worst enemy throughout his treatment for COPD. Dr. Lehmitz repeatedly advised Vandre to stop smoking. Though Chantix was prescribed, Vandre continued to smoke. Vandre told Dr. Lehmitz that he was cutting down. However, the medical records at Regional West clearly reflected that Vandre had smoked two packs of cigarettes a day for the last five or six years. Vandre's testimony that he only smoked half of those cigarettes and left the other half to burn was unconvincing, especially as that testimony might have related to Vandre's post-work injury activities.

63.     Vandre also sabotaged himself by not using his oxygen when it was prescribed. That behavior was noted prior to his work accident and continued after his work accident. That behavior even included Vandre not using his CPAP mask, which was to assist with his sleep apnea. It was noted that Vandre was prescribed 2 liters of oxygen to bleed through the CPAP mask. It was obvious the benefits of the oxygen did not occur since Vandre was not using the CPAP mask.

. . . .

65.     Thus, this Hearing Examiner was presented with an individual who had suffered grievous injury to his lower body, along with chest punctures resulting from

11

fractured ribs. Vandre was then treated for a little more than two months and discharged on the same medications for COPD, and in the same amounts, as he was taking prior to the accident. Upon his discharge, the evidence established that Vandre continued to smoke, ignoring the advice previously given to him by Dr. Lehmitz and then given to him by Dr. Berry. According to the medical records at Western Regional, Vandre smoked at least two packs of cigarettes per day for the five to six years prior to coming to Western Regional on April 12, 2013. That information is consistent with Dr. Lehmitz's January 6, 2006 office note. That period of time would include the moment Vandre was discharged from Eastern Idaho. The evidence also established that Vandre did not use his CPAP. The evidence is clear that Vandre smoked heavily prior to and following his work accident. The evidence also established that Vandre worked in a closed cab while smoking and that he and Carmen smoked together while at home.

66. … In sum, the evidence convinced this Hearing Examiner that Vandre's worsening COPD is a self-inflicted condition caused by his heavy smoking over many years. Vandre's heavy smoking continued even after being placed on oxygen therapy. Vandre has not carried his burden of proof in this matter.

[¶26] The record supports the hearing examiner's finding that Mr. Vandre's prescriptions for oxygen and inhalers to treat his COPD remained largely unchanged before and after his 2007 work accident. We do not agree, however, that that fact alone paints an accurate "before-and-after picture" as it relates to Mr. Vandre's respiratory difficulties. Although Mr. Vandre's COPD-related prescriptions remained consistent before and after Mr. Vandre's work accident, Mr. Vandre's dependence on the prescriptions changed markedly. Mr. Vandre testified that he did not recall being prescribed oxygen before his accident, and regardless of what he may have been prescribed, he rarely, if ever, used oxygen or an inhaler before the accident. He testified that at the time of his accident he was working six to seven days per week, twelve to fifteen hours per day, and he felt that use of even his inhaler would have interfered with work. Concerning his work on the Pinedale project prior to his accident, he testified:

Q.    And you weren't on any oxygen at the time?
A.    No.
Q.    How about an inhaler? Were you using an inhaler?
A.    No, I didn't use it.

12

Q. You had one but . . .

A. Yeah, I mean, I didn't – it'd be in my travel trailer, you know. I didn't have it with me out here on the job.

Q. Were you having any troubles doing your job?

A. Oh, no. No.

Q. Were you having any problems breathing and that sort of thing?

A. No, sir.

[¶27] Dr. Berry explained how it was that Mr. Vandre was able to function with his COPD without the use of the prescribed oxygen and inhaler:

Q. Now, the testimony from Mr. Vandre himself at the hearing was when he was on that job up in Pinedale he was working 12 to 15 hours a day, six to seven days a week, operating heavy equipment on a road construction project.

A. Uh-huh.

Q. And his testimony was that he was not using oxygen at all. And his testimony was that he was functioning okay without oxygen.

A. Uh-huh.

Q. Does that make sense, from what you have seen so far?

A. It does.

Q. Okay. And why?

A. Frequently people will acclimate to lower oxygen saturations and still be able to perform well.

If you take someone with normal lung function and drop their saturations quickly to the mid to upper 80s on the saturations, we won't tend to function well, just because we haven't had time to acclimate to the lower saturations.

Q. Okay. And he testified at the hearing, Mr. Vandre did, that he had the inhaler with him, but he didn't use it on the job, although he had it in his travel trailer.

Would that inhaler have been helpful to him at that time period?

A. A possibility. Speculation is that he didn't feel a significant amount of shortness of breath.

And typically people will carry their inhalers with them if they experience shortness of breath on the job or elsewhere.

[¶28]  In contrast to Mr. Vandre's functioning without oxygen or an inhaler prior to his work accident, Mr. Vandre testified concerning his present dependence on oxygen:

> Q.     Let me ask you this:  In your home when you're sitting in the living room and you need to use the restroom, are you able to walk from the living room to the restroom in one jaunt?
>
> A.     No.  I got to stop a couple times, and it's probably 50 feet from our living room to where our restroom is.  So I got to stop usually three to four times between that time to be able to get my air and senses back about me.  I start getting lightheaded, and my oxygen sats will drop down to in the low 70s or upper 60s.  And I got to stop and try to get them back up to between 87 and 92, and that's where the doctor says that I need to try to keep my – the sats for my oxygen.

[¶29]  Carmen Vandre testified similarly concerning her husband's dependence on oxygen and related treatments before and after his 2007 work accident:

> Q.     Now, you've been around him almost 24/7 since '07?
>
> A.     Yes.
>
> Q.     Do you notice things – can you tell when he's got either too much carbon dioxide?
>
> A.     Yes, I can.  I can look at him and tell.  When we're fixing to have a problem – I don't know how to explain it.  Well, the twitching, he has the involuntary limb movement, but he also – the twitching starts getting more sporadic.  There's a glaze that comes over his face.  He has a lazy eye that will start swelling, I guess you would say.  It starts closing, and he – he just has this bewildered look on him, and when the carbon dioxide gets high, he'll talk at random, you know, because he's – the carbon dioxide has done built up in his head, and you talk at random.  You ramble, if that's the correct word.  I don't know.
>
> Q.     So when you notice those two things, what has to be done when you notice those symptoms?
>
> A.     Well, when I – either Lianne [Mr. Vandre's CNA] or myself see it, we – he has to get up and move around.  He has – what's the name of the little green thing, acapella or something he blows through, and it kind of baffles.  It's hard to flow through.

. . . .

A.	It baffles – it's hard to blow through, let's put it that way, when you blow it, and it helps him move the lung. You know, it forces the carbon dioxide out, and we adjust the oxygen and keep an eye on his oxygen sats at all times.

. . . .

Q.	Okay. Are there – what have you observed when you see, for instance, Mr. Vandre get up from the living room area to go to the restroom?

A.	Oh, his oxygen sats drop tremendously. I mean, he can't – a lot of times – how do I explain this. If he gets up to go, which he has to exercise, he has to have movement, he can take – he can walk from – I don't know from here to that gentleman there. I'm sorry, I don't remember your name.

Q.	Six or seven feet?

A.	Right. And he has to stop and do a recovery time because his oxygen sats will drop down to 67, sometimes 63, and the recovery time is about a minute where he stops and concentrates on his breathing to get his sats back up. He can be 85 to 92, no higher than 93, and then he takes off again and goes another six or seven feet and stops, you know, and does this same procedure until, you know, he gets to the bathroom, you know, or he's doing his walking.

Q.	Now, there's – in some of the early medical records – and what I'm talking about is medical records from Dr. Lehmitz back in 2006 and 2007 prior to Butch's accident – it talks about Dr. Lehmitz recommending that he be on oxygen full-time and use an inhaler?

A.	That didn't happen.

Q.	Okay. That's what I was going to ask you. Did he ever go on oxygen before?

A.	No, no, no.

Q.	Do you recall if he ever had an actual prescription for his own oxygen?

A.	No.

Q.	Now, did you have a prescription for oxygen at the time?

A.	Yes.

Q.	Did he ever use your oxygen?

A.	No. I mean, no, not that I recall. He – he worked all the time. He was never home. He came home on

15

weekends, you know, on Friday, and then Sunday he went
back to work. I don't remember him ever using oxygen.

[¶30] The hearing examiner found Mr. Vandre's testimony generally credible, aside from what the hearing examiner perceived as Mr. Vandre's minimizing of his smoking activities. The hearing examiner likewise accepted Mrs. Vandre's testimony and made no particular finding regarding her credibility. The undisputed testimony thus demonstrates a clear increase in Mr. Vandre's respiratory symptoms and dependence on oxygen and other related therapies after his 2007 work accident. The question then is whether that increase is attributable entirely to Mr. Vandre's heavy smoking and other behaviors, as determined by the hearing examiner, or whether his work injuries also materially aggravated his COPD.

[¶31] The record supports the hearing examiner's findings that Mr. Vandre continued to smoke heavily until the spring of 2013, that Mr. Vandre's smoking caused further lung damage, and that Mr. Vandre's smoking is a significant factor in his respiratory difficulties. The record contains no evidence, however, through expert opinion or otherwise, that Mr. Vandre's smoking or his other behaviors are the sole cause of the increased respiratory difficulties he is experiencing. We do not make this observation in an effort to apportion between the different contributions to Mr. Vandre's respiratory difficulties. Instead, it is simply recognition that while Mr. Vandre's smoking is a significant factor in his present condition, that finding in itself does not preclude a finding that Mr. Vandre's work injuries also play a material role in his present difficulties. The question is not one of measuring the percentage contribution of each factor, but rather whether the work injuries materially aggravated Mr. Vandre's preexisting respiratory condition.[2]

[¶32] As we noted previously, Mr. Vandre presented the opinion of his treating physician, Dr. Berry, that the work injuries materially exacerbated and accelerated the worsening of Mr. Vandre's COPD respiratory issues. In stating those opinions, Dr. Berry did not disagree that Mr. Vandre's smoking exacerbated his COPD. On repeated questioning, Dr. Berry testified that he had advised Mr. Vandre to stop smoking, that Mr. Vandre needed to stop smoking to prevent ongoing lung damage, and that smoking exacerbates shortness of breath, low blood oxygen levels, and recovery from injuries. Dr. Berry testified further, however, that Mr. Vandre's 2007 work injuries also played a significant role in his present respiratory difficulties. He testified:

---

[2] This Court has repeatedly held that an employee is not required to present evidence apportioning and weighing relative contributions to the condition for which benefits are sought. *Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 164, ¶¶ 19-20, 291 P.3d 297, 304 (Wyo. 2012); *Montoya v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 32, ¶ 24, 203 P.3d 1083, 1090 (Wyo. 2009); *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Faulkner*, 2007 WY 31, ¶ 18, 152 P.3d 394, 399–400 (Wyo. 2007). The evidence an employee must present is that his work injury materially aggravated his preexisting condition. *Id*.

Q.    Is Butch Vandre's COPD condition worsening since 2004?

A.    Yes.

Q.    Now, we've talked about the things that can affect Butch Vandre's COPD condition.

A.    Yes.

Q.    Medications can affect it?

A.    Yes.

Q.    Can his neurologic condition, the closed head injury, have an affect (sic) on his COPD?

A.    Yes.

Q.    And in what regard does that have an affect (sic)?

A.    If you have disturbed sleep patterns in any fashion, if that's contributing to a central apnea – which would mean basically a brain-generated sleep apnea problem – the COPD could be compounded –

Q.    Okay.

A.    -- basically because of that.

Q.    And you have no indication that he [had] these sleep disorders prior to the August 23rd of '07 injury.

A.    I don't.  I don't know that a sleep study was done before that.  I don't believe so.

Q.    Okay.  And I know this sounds a little bit far afield, but a missing leg.  Could a missing leg, an amputated leg, have an affect (sic) on his COPD condition?

A.    In various ways it could.

Q.    And in what ways?

A.    If he's got a pain syndrome, and we're having to use narcotics on a patient – we will tend to suppress their breathing.  So they won't tend to saturate as well, just because of that.

Decreased activity, as a result of missing the leg, would tend to worsen everything, as well.

And there's quite a mental component to this, as well.  Just missing the leg and subsequent depression and/or anxiety would worsen it.

And unfortunately, the patient would be more likely to continue or even worsen their smoking, because of the nicotine addiction.

Q.    Okay.  And when you talk about decreased activity, that's essentially a lack of ability to exercise?

17

A.    Yes.

Q.    Is it good for a COPD – generally speaking, for someone with COPD to get exercise?

A.    If they can tolerate it, yes.

Q.    Now, I'm sure you tell every patient who you have who smokes to quit smoke (sic).

Is that not right?

A.    Yes.

Q.    All right.  Now, when you tell people to quit smoking, do you say things to them like, instead of smoking why don't you exercise.

A.    Sometimes.

Q.    Why don't you get engaged in hobbies and activities and so on?

A.    Yes.  Some sort of distraction, if possible.

Q.    Okay.  Because of that work accident, is Butch Vandre inhibited from exercise and hobbies and activities?

A.    He is.

Q.    All right.  Would you agree that there is a link between the work injury of August 23rd of '07 and the worsening COPD and respiratory issues?

A.    Yes.

Q.    Would you agree that it is likely or probable that the results of the work injury of August 23rd of '07 have materially exacerbated the worsening of the COPD respiratory issues?

A.    Yes.

Q.    Would you agree that it is likely or probable that the results of the work injury of August 23rd of '07 have materially accelerated the worsening of the COPD respiratory issues?

A.    Yes.

Q.    Okay.  Now, have all the opinions that you have expressed so far been within a reasonable degree of medical probability?

A.    Yes.

[¶33]  The hearing examiner rejected Dr. Berry's opinion for the following reasons:

64.    Dr. Berry's opinion that Vandre's work accident exacerbated Vandre's preexisting COPD was not explained.  It is not clear, for example, how deflating and reinflating lungs aggravated a condition whereby air is

18

trapped in the lungs. Moreover, as Dr. Berry noted, COPD is typically caused by cigarette smoking, at least in the geographical area in which Dr. Berry practices. Similarly, there was no evidence as to how decortication of the chest wall aggravated or exacerbated Vandre's COPD. Though the Discharge Summary from Eastern Idaho clearly stated that Vandre's recovery was compounded by his COPD, there was no mention of aggravation of COPD in the Discharge Summary. Indeed, Dr. Smith noted that Vandre was discharged on 1-2 liters of oxygen per nasal cannula, which Vandre was on prior to hospitalization. The only ongoing care noted related to Vandre's wound care and lower extremity wound care.

. . . .

66. As noted, Dr. Berry's attempt to connect Vandre's worsening COPD to the accident was unsupported by any explanation as to how this occurred. Further, it was the impression of this Hearing Examiner that Dr. Berry tried to assist Vandre by writing his March 7, 2012 note to the Division. When it came to the attention of Dr. Berry that his information was incorrect, Dr. Berry then inserted the remark that Vandre's oxygen therapy was "moved up" by his work accident. It is not clear what Dr. Berry meant by "moved up." It was the clear impression of this Hearing Examiner that this notation was inserted as a fallback position once Dr. Berry realized that he had provided incorrect information to the Division on March 7, 2007. …

. . . .

75. As noted, Dr. Berry's opinion as to causation and/or relatedness was not heavily weighed, as he provided no explanation for his conclusions and opinions. Moreover, it must be noted that Dr. Berry was a family practitioner and not a pulmonologist. Finally, Dr. Berry was apparently unaware of the extent of Vandre's smoking, even while he was treating Vandre and advising Vandre to stop smoking.

[¶34] This Court gives wide latitude to a hearing examiner's determinations of the weight to be given evidence, including medical evidence and opinions. *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶ 21, 307 P.3d 835, 841 (Wyo. 2013); *Spletzer*, ¶ 21, 116 P.3d at 1112. We will not, however, defer to those determinations if they are clearly contrary to the overwhelming weight of the evidence. *Leavitt*, ¶ 26, 307 P.3d at 842; *Glaze v. State*, 2009 WY 102, ¶ 29, 214 P.3d 228, 235 (Wyo. 2009). Based on our review of the record and Dr. Berry's opinions, we find that

19

the hearing examiner's decision to reject those opinions is contrary to the overwhelming weight of the evidence.

[¶35] First, the hearing examiner's rejection of Dr. Berry's opinions on the ground that he provided no explanation for his conclusions is plainly contrary to the evidence. Dr. Berry explained in both his written opinions and his testimony that Mr. Vandre's prescribed uses of narcotics and sedatives to treat his injuries is suppressing his respiratory function, contributing to his sleep apnea, and contributing to his hypoxemia. He also detailed other contributions Mr. Vandre's injuries have made to his respiratory difficulties and explained those exacerbations.

[¶36] Given the hearing examiner's questioning of how the collapsed right lung Mr. Vandre experienced in his work accident could have worsened his COPD, we believe that what the hearing examiner may have been seeking was evidence of increased physical damage to Mr. Vandre's lungs. That focus was misplaced. We have explained:

> Wyoming law does not require a change in the underlying pathology to find a material aggravation. What it requires is that the work injury combine with the preexisting condition to create the present disability and need for treatment. *See Langberg*, ¶ 28, 203 P.3d at 1104 (holding injury compensable where work injury did not cause Kienbock disease but rendered dormant condition symptomatic, creating need for surgery); *Montoya*, ¶¶ 23–25, 203 P.3d at 1090 (holding fall at work increased symptoms of preexisting traumatic brain injury and created compensable disability); *Ramos*, ¶ 26, 158 P.3d at 679 (holding facial work injury did not create periodontal disease but combined with it to necessitate compensable dental treatment); *Salas v. General Chemical*, 2003 WY 79, ¶¶ 19–22, 71 P.3d 708, 715–16 (Wyo.2003) (holding knee surgery compensable where work injury aggravated pain of preexisting degenerative knee condition).

*Judd v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 85, ¶ 36, 233 P.3d 956, 970 (Wyo. 2010).

[¶37] In *Judd*, we held that claimant's knee surgery was compensable where a fall at work did not change the preexisting degenerative damage to the knee but did materially aggravate the claimant's symptoms. *Judd*, ¶ 37, 233 P.3d at 970. We explained:

> This Court recently decided a case that presented facts similar to this case. *See State ex rel. Wyo. Workers' Safety &*

20

*Comp. Div. v. Slaymaker*, 2007 WY 65, 156 P.3d 977 (Wyo.2007). In *Slaymaker*, the claimant suffered from a preexisting lower back condition, including bulging discs, annular tears and arthropathy, a degenerative condition. *Id*., ¶ 7, 156 P.3d at 980. Following a work injury the claimant suffered when trying to move an all-terrain vehicle, the OAH awarded benefits for a torn muscle and ligament damage but denied treatment for the preexisting conditions. Id. We reversed, explaining:

> Moreover, other evidence presented at the hearing established, without contradiction, that Mr. Slaymaker's physical condition deteriorated significantly following the accident. Prior to May 29, 2003, Mr. Slaymaker was suffering from lower back pain and had sought medical treatment for that condition. However, he was able to manage his pain sufficiently to continue working fifty hours per week at his physically demanding job. Following the ATV accident, he was in severe pain, could no longer work, and needed assistance getting out of his truck.

*Slaymaker*, ¶ 23, 156 P.3d at 985.

> This case presents a nearly identical situation. It is undisputed that Judd's condition changed dramatically after her work injury. Before her fall, she was working forty hours per week without restriction. After her fall, she was unable to put weight on her knee or work. Drs. Ruttle and MacGuire mistakenly concluded that this change did not represent a material aggravation of Judd's preexisting condition, and the Medical Commission erred in relying on those opinions to deny benefits for the aggravation of Judd's preexisting condition.

*Judd*, ¶¶ 37-38, 233 P.3d at 970-71.

[¶38] In this case, there is no evidence that Mr. Vandre's accident increased the physical COPD damage to his lungs. As in the previously discussed cases, however, the evidence is clear that Mr. Vandre's respiratory functioning was materially aggravated and his dependence on oxygen and other respiratory therapies was materially increased. That is, Mr. Vandre's work injuries combined with his preexisting condition to create the need for

21

treatment.  The hearing examiner's rejection of Dr. Berry's opinion on the ground that it was not sufficiently explained is therefore not supported by the record.

[¶39]  We turn then to the hearing examiner's finding that Dr. Berry's opinion should be rejected because he was acting as an advocate for Mr. Vandre and his opinion was a fallback position he was forced to take when confronted with information that Mr. Vandre had in fact been prescribed oxygen and inhalers before his work injury.  We again disagree.  Dr. Berry explained his opinion, and his opinion was consistent with the history of oxygen dependence to which Mr. Vandre testified, which testimony the hearing examiner found credible.  Moreover, we have observed that the criticism that a treating physician is acting as an advocate for his patient "could be said of any treating physician and, consequently, does not justify a wholesale disregard of her testimony."  *Glaze*, ¶ 29, 214 P.3d at 235.

[¶40]  We also reject the suggestion that Dr. Berry's opinion should be discounted because he is a family practice physician rather than a pulmonologist.  It is true, as the Division argues, that the hearing examiner drew no further conclusions based on his observation of Dr. Berry's practice.  Nonetheless, the hearing examiner found that "it must be noted," so we assume he attached some significance to the observation.  The record contains no evidence that a family practice physician is not qualified to offer an opinion on COPD and its complications, and Dr. Berry testified that much of his practice is concerned with lung and heart problems.

[¶41]  Finally, we reject the hearing examiner's discounting of Dr. Berry's opinion on the ground that he was "apparently unaware of the extent of Vandre's smoking, even while he was treating Vandre and advising Vandre to stop smoking."  The hearing examiner does not cite to particular testimony supporting this assertion, and as we noted earlier, Dr. Berry was asked repeatedly and repeatedly responded that Mr. Vandre was a smoker, that he smoked against Dr. Berry's advice, and that the smoking worsened his COPD.  Dr. Berry's treatment notes and testimony make it clear that he was well aware that Mr. Vandre was smoking.  And again, as we noted earlier, the record contains no medical evidence or opinion that Mr. Vandre's smoking is the sole cause of his increased respiratory difficulties, and the employee's expert was not required to apportion between the relative contributions to Mr. Vandre's respiratory condition. *See Montoya*, ¶ 24, 203 P.3d at 1090 ("expert need not apportion between the work activity or injury and the preexisting disease or condition").

[¶42]  Having found that the OAH decision is not supported by substantial evidence, we need not address Mr. Vandre's argument that the OAH acted arbitrarily and capriciously in its ruling.

## CONCLUSION

[¶43]  The OAH conclusion that Mr. Vandre failed to establish that his work injuries did not materially aggravate his preexisting COPD is not supported by substantial evidence. We therefore reverse and remand to the district court for entry of an order remanding to the OAH for entry of an order awarding benefits for the treatments covered by the four final determinations at issue herein.