2018 WY 10

**In the MATTER OF the Worker's Compensation Claim of Richard R. WILLIAMS.**

**State of Wyoming, ex rel., Department of Workforce Services, Workers' Compensation Division, Appellant (Respondent),**

v.

**Richard R. Williams, Appellee (Petitioner).**

S-17-0142

Supreme Court of Wyoming.

February 5, 2018

Representing Appellant: Peter K. Michael, Wyoming Attorney General; Daniel E. White, Deputy Attorney General; J.C. DeMers, Senior Assistant Attorney General; and Benjamin Eliazar Fischer, Assistant Attorney General.

Representing Appellee: Larry B. Jones of Burg Simpson Eldredge Hersh & Jardin, P.C., Cody, WY.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

HILL, Justice.

[¶1] Richard Williams suffered a head injury while working as a well operator and applied for workers' compensation benefits. In Mr. Williams' version of events, a flash fire startled him and caused him to fall backward and strike his head. Because the building in which Mr. Williams was working when he suffered his injury showed no signs of a recent fire, the Wyoming Workers' Compensation Division (Division) determined that Mr. Williams' injury did not arise out of and in the course of his employment and denied benefits.

[¶2] The Office of Administrative Hearings (OAH) upheld the denial of benefits based on its finding that Mr. Williams and his version of events lacked credibility, and Mr. Williams filed a petition for review in district court. The district court concluded that the OAH decision was contrary to overwhelming medical evidence that Mr. Williams injured his

head while engaged in work-related activities and reversed. We affirm.

## ISSUE

[¶3] The Division presents two issues on appeal, which we restate as a single issue:

I. Is the OAH decision upholding the Division's denial of benefits contrary to the overwhelming weight of the evidence?

## FACTS

[¶4] In June 2014, Richard Williams was employed by L&L Enterprises as a well operator at the North Buck Draw Unit (NBDU), a field owned and operated by EOG Resources, Inc. (EOG) in Campbell County, Wyoming.[1] In that position, Mr. Williams oversaw production of twenty-four oil wells and maintained the operation's oil separator units. He generally worked alone, eight days on, six days off.

[¶5] On June 21, 2014, Mr. Williams followed his normal daily routine and arrived at the field at about 7:00 a.m. He checked the better-producing wells for any immediate attention that might be required and then headed to the process building. In the process building, he checked the separators, dump valves, and fluid levels to ensure they were working properly. He then exited the back of that building and checked the gas metering station to record gas sales for the previous day. Mr. Williams then returned to his truck and drove to the dehydration building.

[¶6] At approximately 8:30 a.m., as Mr. Williams was driving to the dehydration building, he received and responded to a text message from his wife. A short time after that text message, he arrived at the dehydration building and began his tasks there. He first checked the three-stage separator and the reboiler and then went out the building's back door to the treater, where he checked the oil water, dump valves, and other parts of the machinery to ensure everything was working properly.

---

1. EOG purchased the NBDU lease from Merit Energy Company in October 2013. Mr. Williams held the same position when Merit owned the lease, except that he worked directly for Merit rather than through a subcontractor (L&L).

[¶7] After completing that task, Mr. Williams returned to the dehydration building to check the condensate collected in the separators. Under normal conditions, a pump would direct the condensate fluid through the separators into the treater, but that pump had broken down about a year earlier. To compensate for the lack of a pump, Mr. Williams was instructed to manually empty both separators into a subfloor containment unit. The larger of the separators had a valve that would allow its condensate to be emptied into the containment unit, but for the smaller separator, Mr. Williams was instructed to use a metal bucket to collect the liquid and then dump the liquid into the containment unit. Mr. Williams explained:

Q. So you were dumping something in the bucket. What is it that you were dumping?

A. That's condensate. Because what happens is the reboiler super-heats the glycol and as a result the condensate in it and the water in it evaporate into steam and end up going out the top and into a condenser, where it gets cooled back off and turned to a liquid and dumped into this scrubber, I guess you can call it.

And then naturally when that happens you are going to have gas in with that, so then all of that gas, and whatnot, flows out the top of that over to the scrubber where it drops out the rest of any liquids, and whatnot, that it can. And the gas goes out to a flare stack to get burned off for EPA regulations.

And what happens that—like I say, the fluid in there most typically is condensate because it's the lightest and it's the thing that carries with the gas the most, so that's why we have to keep that scrubber empty, because if it fills up then you start having condensate overflowing, going out into the gas fumes into the flare stack and the flare stack gets too hot and bad things happen.

So that's what I was dumping into the bucket was the condensate from that scrubber and then putting it into this containment tank until it gets full, and then we'd have them come haul it off however, you know, you need to when it gets full.

Q. So you're working with very flammable substances?

A. Yes.

[¶8] To reach the containment unit's opening, where the bucket with condensate from the smaller separator would be dumped, Mr. Williams had to step up onto a platform about six to twelve inches off the building's concrete floor. Mr. Williams did this, and according to his version of events, while he was emptying the contents of the bucket into the containment unit, he saw a flash of fire come over the top of the bucket. This startled him and he stumbled backwards, fell off the platform, hit his head on the building's concrete floor, and lost consciousness. When he awoke, he saw what appeared to be the containment unit on fire. He then retrieved the fire extinguisher mounted outside the building's door and sprayed the fire extinguisher in a back and forth sweeping motion until he reached the containment unit, which he also sprayed with the extinguisher.

[¶9] At 8:48 a.m., Mr. Williams called 911 from his truck and reported the fire and his fall. An ambulance and fire unit responded, and Wyoming Life Flight was also dispatched to the location. The EMS report noted:

Dispatched 911 to the North Buck Draw Station for a male that fell backward after a flash-over. Patient hit his head and complains of head pain. Dispatch advised patient becoming drowsy and not responding well. Wyoming Life Flight requested prior to arrival on scene.

Upon arrival patient awake and in the front seat of his vehicle. Patient states "worst headache ever". Patient states pain is in the back of his head. Pain is described as a stabbing pain in the occipital area. No obvious signs of injury noted, no hematoma, no swelling and no crepitus. * * * While waiting for life flight to land, patient describes pain as moving in his head and still sharp in nature. * * *

[¶10] The Campbell County Fire Department arrived at the scene at about 9:15 a.m. It reported its response and findings as follows:

\* \* \* Dispatch advised that the patient indicated that there had been a flash fire caused by condensate with which he was working. Additional information indicated that the patient had experienced loss of consciousness, and he was difficult to understand. Dispatch advised that they were attempting to keep the patient awake with phone conversation. Dispatch relayed that the patient thought the fire was out after he used a fire extinguisher.

During the initial response, Campbell County Memorial Hospital (CCMH) Emergency Medical Services (EMS) requested LifeFlight and requested CHF4 Shank to be the ground contact.

\* \* \*

Upon arrival, EMS was on scene attending to the patient, who was able to direct CHF4 Shank to the processing building as the area where the incident occurred; there was no fire showing from the processing building. Upon further investigation inside the processing building, there was no fire or smoke visible. There was a distinct odor that was not recognizable to CHF4 Shank. It appeared that an ABC fire extinguisher had been discharged inside the structure, as there was material similar to dry-chemical extinguishing agent across most of the interior. No evidence of fire, smoke or spill was evident upon initial investigation. No smoke, soot or singed materials were present.

\* \* \*

CHF4 Shank made the decision to close the building and secure it for EOG Resources. CHF4 Shank did not immediately return to investigate because of the unknown nature of the situation and the volatility of the condensate potentially involved in the initial incident.

\* \* \*

As the property was a gas processing site, CCFD did not have jurisdictional authority to conduct a fire origin and cause investigation, and no request was made by the owner for CCFD to conduct an investigation.

[¶11] Mr. Williams was placed on the Life Flight helicopter and transported to the Wyoming Medical Center in Casper, Wyoming.

The Life Flight notes indicate Mr. Williams was unable to walk without assistance due to severe dizziness, and he was "found to have a hematoma to the basilar region with no other external signs of injury."

[¶12] Upon arrival at the Wyoming Medical Center, Mr. Williams was treated in the emergency room by Dr. Eugene Duquette. Dr. Duquette reported that "[i]nitially, it is very difficult to get a history from this gentleman. He is very concussive when he first gets here; he actually clears as time progresses." On physical examination, Dr. Duquette found "some bruising and an abrasion with some puffiness on his posterior occiput." Dr. Duquette assessed Mr. Williams as having a "[c]losed head injury with postconcussion syndrome and occipital hematoma," and discharged him with a pain medication prescription and "closed head injury precautions."

[¶13] On June 23, 2014, Mr. Williams completed and signed a report of injury for submission to the Division. On that same date, at the request of EOG, Mr. Williams returned to the dehydrator building to do an accident reconstruction. During that meeting, Mr. Williams became concerned that EOG did not intend to address what he felt were dangerous conditions at the site, and he therefore, on June 24, 2014, submitted a complaint to OSHA reporting his safety concerns.

[¶14] On June 25, 2014, Roger Eagleston, a senior OSHA compliance officer, investigated the site and concluded that each of the eight hazards Mr. Williams reported had merit. He also reported:

\* \* \* With the evidence obtained during this inspection I have concluded beyond a reasonable doubt that a flash fire could not have occurred. Fire Chief, Bill Swank of the Campbell County Fire department-Wright concurred with my findings. [EOG] Denver based Safety Manager Mike McDonald stated there (sic) internal review of the matter and his prior experience as a professional firefighter have led [EOG] to conclude a flash fire could not have occurred.

[¶15] Mr. Williams followed-up with his primary care provider on June 25, 2014, and reported decreased focus, increased anxiety, difficulty sleeping, and a recurring replay of the flash fire. He was diagnosed with situational anxiety and early post traumatic stress disorder (PTSD) and prescribed Xanax and continued counseling. At his next appointment, on July 1, 2014, Mr. Williams reported worsening anxiety and flash backs to the fire. His prescription was changed from Xanax to Klonopin, with instructions to continue counseling. He was "excused from work for another week until his anxiety is under better control."

[¶16] On July 2, 2014, Mr. Williams saw Kelley Boltin, M.S., P.P.C., of the Wellness Centers, LLC. Ms. Boltin noted that Mr. Williams had "a lengthy history of depression and anxiety," but since his work accident "he has experienced intrusive thoughts, he replays the scenario, cannot sleep, is hypervigilant, angry, irritated, annoyed easily, and becomes angry [over] simple things." Ms. Boltin diagnosed Mr. Williams with amnestic disorder due to a general medical condition and PTSD and recommended that he attend weekly psychotherapy, which he has done. Ms. Boltin explained her diagnosis:

A. Amnestic disorder due to a general medical condition is when the brain has sustained some type of trauma, the brain will rewire itself.

There will be a temporary or a permanent loss of memory, depending on how severe the injury is, because what happens with the brain is the brain ricochets; so it will rewire itself immediately as a way to heal and as a way to get the synapses, the axions and neurons firing.

Q. And how has that affected Mr. Williams?

A. It has delayed his cognitive processing, his ability to understand the external surroundings. His anger, his emotional regulations, inability to concentrate, forgetfulness. It has impacted his total quality of life.

[¶17] On July 24, 2014, the Division issued a final determination denying Mr. Williams' claim for workers' compensation benefits.

The final determination stated the following as the basis for the Division's denial:

The medical documentation and the site investigation received do not support that an injury arose out of and in the course of your employment on June 21, 2014. Wyoming Statute § 27-14-102(a)(xi)

The incident, as reported to the Division, does not meet the definition of injury. (Wyoming Statute § 27-14-102(a)(xi)).

[¶18] Mr. Williams requested a hearing and his case was referred to the OAH for a hearing. After the case was referred to the OAH, Mr. Williams sought treatment from two additional specialists. He saw Dr. Harry Hamlyn, M.D., at Rapid City Regional Hospital Behavioral Health on September 22, 2014. He was then assessed by Dr. Dennis Helffenstein, Ph.D., C.R.C., a licensed clinical psychologist at Colorado Neuropsychological Associates, P.C., following a two-day evaluation that took place on October 27, 2014 and October 28, 2014.

[¶19] Dr. Hamlyn's treatment notes indicate that Mr. Williams presented with a complaint "that ever since having a traumatic brain injury June 21, 2014, he is having a very difficult time with handling his emotions and memory." Dr. Hamlyn noted Mr. Williams' history of anxiety and depression, but he concluded:

1. I told him that it does sound like he has had a post-concussive syndrome from his traumatic brain injury and very likely also has post-traumatic stress disorder with significant anxiety and depression symptoms. There may even be a major depression present. It also sounds like he has had a long-term social anxiety disorder. * * *

2. I feel that Mr. Williams is not capable of working at his job at this time and I do not feel that he is capable of working at any job because of his emotional problems and memory and concentration issues.

3. I recommended that he have neuropsychological testing done to measure his level of memory difficulties and concentration and cognitive abilities. * * * I also recommended he continue in counseling.

[¶20] Mr. Williams had the recommended neuropsychological testing done by Dr. Helffenstein, who conducted testing and a clinical interview of Mr. Williams over a two-day period. Dr. Helffenstein diagnosed Mr. Williams as suffering: mild neurocognitive disorder due to traumatic brain injury with behavioral disturbance (behavioral disturbance includes irritability and reduced stress tolerance); depressive disorder due to traumatic brain injury; and post-traumatic stress disorder. He opined:

> My overall impression is that Mr. Williams' MMPI-2-RF profile represents his honest report of persisting physical, neurological, and emotional/psychological symptoms associated with physical injuries, a Post-Concussive Syndrome, and PTSD associated with the accident. To some degree, his report of depressive and anxiety symptoms could relate to pre-existing depression and anxiety as discussed in my report. However, my overall impression based on my clinical interview with Mr. Williams and review of records is that the great majority of the depression and anxiety relate to injuries sustained in the accident of June 21, 2014. I see no indication of any maladaptive pre-existing personality traits or characteristics.

> * * *

> * * * As noted in the body of the report, there were multiple indicators to suggest that Mr. Williams was giving good effort to the neuropsychological testing process. There was no indication that he was attempting to feign cognitive problems on testing. Based on the data that I currently have available to me, I am not aware of any pre-existing or co-existing medical, neurological, developmental, psychological, or psychiatric conditions that could account for Mr. Williams' current cognitive deficits with the exception of a Traumatic Brain Injury sustained in the work-related accident of June 21, 2014. When all of the above factors are considered together, it is my opinion within a reasonable neuropsychological certainty that the cognitive deficits noted on testing relate directly and solely to a Traumatic Brain Injury sustained in the work-related accident of June 21, 2014.

Mr. Williams was evaluated at four months post-accident. It is expected that he will make additional cognitive recovery and a neuropsychological re-evaluation is recommended in 14 months as a way to monitor his progress and recovery.

> * * *

> It is my opinion as both a neuropsychologist and vocational expert that when one considers a combination of Mr. Williams' physical, fatigue, visual, cognitive, and emotional coping/psychological deficits that he is totally disabled from competitive employment at this time. My expectation is that he will remain disabled from competitive employment for at least 12 months post-accident. As a result, I feel he is eligible for Social Security Disability Insurance (SSDI) benefits. I will re-evaluate Mr. Williams' vocational potential at the time of his reevaluation.

[¶21] On September 15, 2015, the OAH held a contested case hearing, and on November 5, 2015, it issued its Findings of Fact, Conclusions of Law, and Order, which upheld the Division's denial of benefits. The hearing examiner cited inconsistencies between Mr. Williams' version of events and other evidence. In particular the hearing examiner pointed to Mr. Williams' report to the Division that he suffered minor burns to his hand and bleeding from his head wound, and to his report of a fire, which the hearing examiner found unsupported by and contrary to the evidence. The hearing examiner reasoned:

> * * * There is no evidence to support the Claimant's contentions. Without any such corroborating evidence, the Office must find that the overwhelming weight of the evidence would indicate that the incident as testified to by the Claimant did not occur. Furthermore, the Office finds that the Claimant lacks any credibility. There is no evidence to support his statement that he had bleeding on the back of his head as he so testified. There is no evidence that he had burns on his right hand or bruising on his back and left arm as set forth in his written statement to the Division. The initial EMT records indicated no "obvious signs of injury." He could not have put out

the fire as he testified without leaving footprints in the dry chemical from the extinguisher. With such lack of credibility, together with the OSHA report which concluded "beyond a reasonable doubt that a flash fire could not have occurred", the Office must find that the Claimant has not met his burden of proof to show that a compensable injury occurred.

The Office notes that the Claimant's medical evidence indicates evidence of post-concussion syndrome and PTSD. But such diagnoses are made on the basis of a fall sustained as a result of striking his head when startled by a flash fire which the evidence does not support. In any event, the Office finds that the Claimant has not met his burden of proof to establish a compensable injury and benefits should be denied.

[¶22] On November 23, 2015, Mr. Williams filed a petition seeking the district court's review of the OAH order. Following briefing, the district court entered an order reversing the OAH order. The district court accepted the OAH finding that no flash fire occurred but reversed the OAH order based on its conclusion that, regardless of what caused Mr. Williams to fall, the overwhelming evidence showed that Mr. Williams fell and suffered a head injury while engaged in work activities. The Division filed a timely notice of appeal to this Court.

### STANDARD OF REVIEW

[¶23] We review an administrative appeal as if it came directly from the administrative agency, giving no deference to the district court's ruling on the appeal. *Price v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 16, ¶ 7, 388 P.3d 786, 789 (Wyo. 2017). Our review is governed by statute and requires that we:

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

. . . .

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2017).

[¶24] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Price*, ¶ 7, 388 P.3d at 789-90 (quoting *Matter of Worker's Comp. Claim of Jensen v. State*, 2016 WY 87, ¶ 13, 378 P.3d 298, 303 (Wyo. 2016)). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." *Id.* We review a conclusion that the claimant failed to meet his burden of proof as follows:

If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Price*, ¶ 7, 388 P.3d at 790 (quoting *Worker's Comp. Claim of Bailey v. State ex rel. Dep't of Workforce Servs.*, 2015 WY 20, ¶ 11, 342 P.3d 1210, 1213 (Wyo. 2015)).

### DISCUSSION

[¶25] An employee bears the burden of proving a claim for workers' compensation benefits, which requires:

An employee-claimant in a worker's compensation case has the burden to prove all the statutory elements which comprise a compensable injury by a preponderance of the evidence. This includes establishing the cause of the condition for which compensation is claimed and proving that the injury arose out of and in the course of employment.

An injury "aris[es] out of" the employment when a causal connection exists between the injury and the conditions under which the work is required to be performed. Under these guidelines, "if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment." An injury is not compensable if it cannot fairly be traced to the employment as a contributing cause and if it comes from a hazard that the employee would have been equally exposed to outside of the employment.

*In re Worker's Comp. Claim of Gomez v. State*, 2010 WY 67, ¶ 8, 231 P.3d 902, 904-05 (Wyo. 2010) (quoting *Finley v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 46, ¶ 8, 132 P.3d 185, 188 (Wyo. 2006)).

[¶26] The Division contends that the record supports the OAH determination that Mr. Williams did not meet his burden of proof and the district court thus erred in reversing the OAH order. In so contending, it offers two arguments: 1) that the district court improperly reweighed the evidence; and 2) that even if the district court did not improperly reweigh the evidence, Mr. Williams' only evidence that his work caused his head injury was that the injury occurred on the work premises and that evidence is, as a matter of law, insufficient to prove the required causal relationship. Because the Division's second argument speaks to a claimant's burden of proof, we will address that argument first, and then we will turn to our review of the OAH order.

## A. Injuries Occurring on Work Premises

[¶27] In support of its first argument, the Division points to our decision in

*Finley*, where we held that "[p]resence on an employer's premises is insufficient by itself to establish the requisite nexus between the injury and employment." *Finley*, ¶ 9, 132 P.3d at 188 (citing *Matter of Injury to Corean*, 723 P.2d 58, 60 (Wyo. 1986)). In relying on this holding, the Division argues that Mr. Williams was required to prove "that the fall was attributable to a work condition, rather than an idiopathic syncopal episode or some other cause." We disagree.

[¶28] In *Finley*, we discussed *Corean*, from which the above-quoted holding came, and observed that in *Corean*, "we rejected a contention that a causal nexus between an employee's injury and his employment should be **conclusively established** based solely upon the fact that the injury occurred on the employer's premises." *Finley*, ¶ 9, 132 P.3d at 189 (citing *Corean*, 723 P.2d at 60) (emphasis added). The use of the term "conclusively established" is important because in 1990, after *Corean* but before *Finley*, we adopted what is known as the premises rule, which provides that when an employee is injured on the work premises, a presumption is raised that the injury is causally connected to his employment. *Archuleta v. Carbon Cty. Sch. Dist. No. 1*, 787 P.2d 91, 94 (Wyo. 1990). In adopting the premises rule, we explained:

> We noted in *Corean* that on-premises accidents are, indeed, most often causally connected to employment, thereby suggesting that a presumption created by rule might have considerable validity, albeit not the conclusive validity argued for in *Corean*. A trend toward adoption of a premises rule, insofar as it creates a rebuttable presumption of causal connection, has been foreshadowed by a number of our prior decisions.

*Archuleta*, 787 P.2d at 93.

[¶29] In other words, the premises rule, which we adopted in *Archuleta*, provides that when an employee is injured on the work premises, that fact will not conclusively establish the required causal link, but it will raise a presumption that the injury is work related. *Archuleta*, 787 P.2d at 94; *State ex rel. Wyo. Worker's Compensation Div. v. Miller*, 787 P.2d 89, 90 (Wyo. 1990). Under

the rule, once the employee makes a showing that the injury occurred on the work premises, the burden shifts to the Division (or employer) to present evidence that the injury was not work related. *Archuleta*, 787 P.2d at 94.

[¶30] In this case, no evidence was presented that Mr. Williams suffered his head injury anywhere other than the work site, and the work site is where he was located when emergency personnel responded to his 911 call. Given these undisputed facts, we can only conclude that Mr. Williams presented sufficient evidence to raise the presumption that his head injury arose out of his employment. This presumption shifted to the Division the burden to present evidence to overcome the presumption. We have said:

A presumption simply means that in the absence of any other evidence to the contrary, the fact presumed is conclusive. If, however, there is sufficient evidence to the contrary, then it becomes a question of weight and credibility for the trier of fact.

*Hillard v. Marshall*, 888 P.2d 1255, 1260 (Wyo. 1995); *see also Gomez*, ¶ 8, 231 P.3d at 905, n.1. (finding the presumption rebutted where employee was fatally injured on work premises by violent altercation outside his work duties).

[¶31] In meeting its burden, the Division could not rely solely on speculation that something other than work, such as something idiopathic, caused Mr. Williams to fall. Our task in reviewing the OAH order, then, is to determine whether the Division presented sufficient evidence to allow the OAH to find that the presumption had been rebutted.

**B. Review of OAH Order**

 [¶32] The OAH, as fact finder, has wide latitude to make credibility determinations and assign weight to evidence. *In re Vandre*, 2015 WY 52, ¶ 19, 346 P.3d 946, 952-53 (Wyo. 2015). It may disregard medical opinion testimony and evidence if it finds the evidence "unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete and inaccurate medical history provided by the claimant," *Bailey*, ¶ 16, 342 P.3d at 1214 (quoting *Watkins v. State ex rel. Wyo. Med. Comm'n*,

2011 WY 49, ¶ 25, 250 P.3d 1082, 1091 (Wyo. 2011)). Our deference to these types of determinations is not, however, without bounds. We have explained:

This Court gives wide latitude to a hearing examiner's determinations of the weight to be given evidence, including medical evidence and opinions. *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶ 21, 307 P.3d 835, 841 (Wyo.2013); *Spletzer [v. State ex rel. Wyoming Workers' Safety and Compensation Div.]*, [2005 WY 90] ¶ 21, 116 P.3d [1103] at 1112. We will not, however, defer to those determinations if they are clearly contrary to the overwhelming weight of the evidence. *Leavitt*, ¶ 26, 307 P.3d at 842; *Glaze v. State*, 2009 WY 102, ¶ 29, 214 P.3d 228, 235 (Wyo.2009).

*Vandre*, ¶ 34, 346 P.3d at 959.

[¶33] Based on our review of the record, we are unable to defer to the OAH's wholesale rejection of Mr. Williams' testimony and his reported head injury. We agree with the district court and Mr. Williams that the OAH conclusion runs contrary to the overwhelming weight of Mr. Williams' medical and other evidence, to which the Division offered no rebuttal.

[¶34] Contrary to the Division's assertion, Mr. Williams did not limit his showing to evidence that he was at work when the injury occurred. He went beyond the evidence necessary to establish a presumption of compensability and presented testimony and evidence concerning that task he was performing, the details of his fall, and the details of his head injury and its symptoms.

[¶35] We begin with the task Mr. Williams alleged he was performing when the accident occurred. Mr. Williams testified he was dumping condensate from the smaller of two separation units into a containment unit, per his supervisor's directions. The Division presented no evidence that this task was not one Mr. Williams had been directed to perform and no evidence that this aspect of Mr. Williams' version of events lacked credibility. Indeed, the OSHA compliance officer confirmed in his report that, based on his investigation, which included interviews with the

site owner, this was in fact the direction given to employees working at this site. The OSHA report stated:

> **Employee Exposure:** Employees assigned to operate and maintain the NBDU location are directed to enter the Dehydrator building, check condensate levels within the large and small scrubbers. Employees then use a metal bucket to drain contents from the small scrubber; the bucket is then dumped into the opening created by the hinged floor door while in the open position.

[¶36] Because the Division made no showing that Mr. Williams' reported work activity lacked credibility, or was otherwise inconsistent with his position, evidence of the work-related task Mr. Williams was performing when he fell went unrebutted by the Division. This brings us to Mr. Williams' next showing, his testimony describing how he fell and the injuries he sustained. On this question, the Division did present rebuttal evidence showing that no flash fire occurred, and the OAH accepted that evidence as credible. We have no difficulty accepting that finding, but we disagree that a finding that no fire occurred supports a conclusion that Mr. Williams did not fall and suffer a head injury. Mr. Williams offered ample corroborating evidence of his fall that the Division failed to rebut.

[¶37] In addition to the evidence corroborating that the task Mr. Williams reported he was performing was indeed an assigned task, Mr. Williams offered photographs of the containment unit. Those photographs showed the containment unit's opening to be on the elevated platform off of which Mr. Williams reported he fell. Perhaps most importantly, the great weight of the uncontroverted medical evidence corroborated Mr. Williams' reported head injury. While the initial EMS response team reported no obvious wounds, the Life Flight nurse who examined him immediately thereafter documented a "hematoma to the basilar region." Additionally, the emergency physician described Mr. Williams as "concussive," documented "some bruising and an abrasion with some puffiness on his posterior occiput," and assessed him as hav-

ing a "[c]losed head injury with postconcussion syndrome and occipital hematoma."

[¶38] This unrebutted evidence corroborates that whether there was or was not a fire, Mr. Williams did fall and did suffer a head injury. We likewise reject the finding that Mr. Williams' report of a fire that did not occur destroys the credibility of Mr. Williams' testimony in its entirety. In addition to the fact that such a finding is contrary to the great weight of the corroborating evidence, Mr. Williams offered an alternative explanation for the misreported fire. Kelley Boltin, Mr. Williams' counselor who has met with him for weekly psychotherapy sessions since a week after his injury, testified:

> Q. Okay. One of the issues in this matter is whether a fire occurred or not. I will state that the Workers' Compensation Division does not believe that there was a fire.
>
> And Mr. Williams—and you have heard from Mr. Williams, that he believes that there was a fire.
>
> Is there a medical manner in which that can be explained if there indeed was not a fire?
>
> A. Yes, there is.
>
> Q. What is that?
>
> A. The brain is a very unique organ. Here's how it operates. The brain will register or encode the last thing that happened. So hypothetically speaking, we have been trained, conditioned.
>
> Flashes. Flashes can be from a camera. Flashes can be from lightening. Flashes can be from fireworks. Flashes can be from a light bulb that burns out, you know, many different things. And it also represents fire.
>
> So if there was a flash, the brain goes through this, this fantastic process of ruling everything out. There was no camera in there. There was no lightning. Weather conditions can validate that.
>
> So it goes through this whole process, and it arrives at this conclusion of it had to have been a fire. The flash had to have been a fire. That's what the brain encodes. That's what Richard believes happens.

Something happened that startled him to the point where he was startled. He fell backwards, and knocked himself out.

And the occipital lobe just—just so I can help answer the next question, I believe—I'm not trying to pre-plan here—is the occipital lobe operates on sense of sight. It registers sense of sight.

So the flash was a sense of sight, and it registered as a fire.

Q. And I've looked into this a little bit. That's sometimes referred to as conflabulation?

A. Confabulation.

Q. Confabulation. Where—and maybe I'm putting words in your mouth—where the brain fills in some of the blanks?

A. Yes.

Q. Okay. In your opinion, in your medical opinion, does Mr. Williams believe that there was a fire?

A. Yes, he does.

[¶39] Of course the OAH could reject Ms. Boltin's testimony and any other medical evidence in the record, but if that rejection is to be sustained on review, the OAH must provide "reasons for doing so based upon determinations of credibility or other factors contained in the record." *Price*, ¶ 7, 388 P.3d at 790 (quoting *Bailey*, ¶ 11, 342 P.3d at 1213). Here, the OAH offered only one isolated explanation for its rejection of the medical evidence:

The Office notes that the Claimant's medical evidence indicates evidence of post-concussion syndrome and PTSD. But such diagnoses are made on the basis of a fall sustained as a result of striking his head when startled by a flash fire which the evidence does not support.

[¶40] This explanation finds no support in the record. The medical evidence in this case documented a head injury caused by a fall, not by a fire. Likewise, the resulting cognitive difficulties and other symptoms were caused by the head injury, not by the alleged fire. Thus, while we accept the OAH finding that no fire occurred, we do not accept this as a basis to altogether reject Mr. Williams' reported head injury.[2]

[¶41] While we do not defer to a district court's decision on a petition for review, we agree with the district court's reasoning in this matter. The court concluded:

However, whether a flash fire caused the fall or Mr. Williams was simply careless, is irrelevant. It was the fall, not the fire that caused the head injury. The fact that Mr. Williams was completely mistaken (or even lied about the cause of the fall) cannot lead to the conclusion that his testimony that a fall occurred while at work should be disregarded. As outlined above, there is overwhelming, uncontradicted evidence, and certainly all of the medical evidence, which indicates that Williams sustained a closed head injury after falling backwards at the plant and striking the back of his head on a concrete floor. Mr. Williams was not required to prove fault. "The concept of fault does not enter the calculation so long as the employee is engaged in work-related activities when injured." *Perry v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2006 WY 61, ¶ 22, 134 P.3d 1242, 1249 (Wyo. 2006). The threshold question is "whether the injury occurred while the employee was engaged in a task which is part of the employee's work." *Id.* Thus, he did not have to prove that the flash fire caused his fall at work, only that he fell while engaged in work-related activities.

---

2. We are likewise unpersuaded by the OAH reliance on Mr. Williams' supplemental note to the Division that reported a burn to his hand, bleeding from his head wound, and bruising on his arm and back, which the order cites as evidence of Mr. Williams' lack of credibility because he did not report the injuries to any of his health care providers and they were not otherwise documented. As to the bleeding from his head, Mr. Williams reported minor bleeding, which is not entirely inconsistent with the emergency physician's observation of an abrasion to his head. As to the other injuries, Mr. Williams indicated in his note that he was providing the information because he had been advised to notify the Division of all injuries however minor or insignificant. These otherwise unreported and undocumented injuries are not the injuries for which Mr. Williams has sought workers' compensation benefits, and whatever inconsistencies these minor injuries may represent, they simply do not outweigh the overwhelming and unrebutted evidence of Mr. Williams' head injury.

In this case, the overwhelming medical evidence is that Mr. Williams suffered a blow to his head while doing his job. There was no evidence that Mr. Williams was not engaged in a work-related activity when he fell at work and struck his head on the concrete floor. This is not a situation where an injury occurred because an employee violated a work restriction imposed by the employer. *Matter of Smith*, 762 P.2d 1193, 1196-97 (Wyo. 1988). On the contrary, Mr. Williams was acting within the scope of his employment, performing a hazardous task at the direction of his employer as a workaround to repairing the equipment on site.

[¶42] Mr. Williams presented evidence that raised a presumption that he suffered a work-related injury. In response, the Division offered: no evidence that Mr. Williams was injured somewhere other than on the work premises; no evidence that Mr. Williams was not engaged in work activities; no evidence that Mr. Williams did not fall; and no evidence that he did not suffer a head injury. In short, the Division's evidence rebutted Mr. Williams' claim that a fire occurred, but it did not rebut the presumption that Mr. Williams suffered a head injury that arose out of his work. The OAH erred in ruling otherwise.

## CONCLUSION

[¶43] Mr. Williams offered evidence sufficient to raise a presumption that he suffered a head injury that arose out of his employment, and the Division failed to rebut that presumption. We therefore agree with the district court that the OAH erred in upholding the denial of benefits. Affirmed.